# UNITED STATES BANKRUPTCY COURT

### EASTERN DISTRICT OF VIRGINIA
### NEWPORT NEWS DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| WILLIAM KENNETH MATKINS, | ) | |
| CHRISTY ANN FULLER-MATKINS, | ) | |
| | ) | Case No. 18-50047-SCS |
| *Debtors.* | ) | |
| | ) | |
| | ) | |
| COMMERCIAL CASH FLOW, L.L.C., | ) | |
|  T/A BEACH COMMERCIAL FINANCE, | ) | |
| | ) | APN 18-05007-SCS |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIAM KENNETH MATKINS, | ) | |
| | ) | Chapter 7 |
| *Defendant.* | ) | |
| | ) | |

## MEMORANDUM OPINION

This matter came on for trial on February 12, 2019, upon the Corrected Complaint to Determine Nondischargeability of Debt pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(4), filed by Commercial Cash Flow, L.L.C., t/a Beach Commercial Finance ("Beach Commercial"). At the conclusion of the trial, the Court took this matter under advisement. The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(b)(2) and 1334(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. Upon consideration of the evidence, arguments presented by counsel at the trial, and pleadings submitted, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## I. PROCEDURAL HISTORY

William Kenneth Matkins ("Matkins") and Christy Ann Fuller-Matkins (collectively, the "Debtors") filed, by counsel, a petition under Chapter 7 of the United States Bankruptcy Code on January 17, 2018. The § 341 Meeting of Creditors was held on February 12, 2018, and adjourned to March 26, 2018, on which date the meeting was concluded. The Debtors received their Chapter 7 discharge on April 18, 2018. Five days prior, on April 13, 2018, Beach Commercial filed a Complaint to Determine Nondischargeability of Debt pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(4), which commenced the above-captioned Adversary Proceeding. A corrected complaint was filed on April 15, 2018. Corrected Complaint to Determine Nondischargeability of Debt, Adv. Proc. No. 18-05007-SCS, ECF No. 4 (hereinafter, "Complaint").[1]

In the Complaint, Beach Commercial requests that the Court deny the dischargeability of the debt owed by Matkins pursuant to a factoring agreement entered into by Matkins's company, Bay Rivers Industrial, Inc. ("Bay Rivers"), and Beach Commercial, and a guaranty as to that agreement signed by Matkins. Complaint, at paras. 9, 11. Under the factoring agreement, Bay Rivers sold product invoices to Beach Commercial in exchange for funds. *Id*. at para. 9. By purchasing the invoices, Beach Commercial acquired the right to receive the payment proceeds of the invoices. *Id*. at para. 10. Matkins guaranteed all debts and obligations that Bay Rivers incurred under the factoring agreement. *Id*. at para. 11. Beach Commercial seeks a determination of nondischargeability pursuant to the guaranty.

While Beach Commercial alleges that Bay Rivers continually violated the terms of the factoring agreement, the Complaint focuses on the nondischargeability of proceeds arising from

---

[1] The Corrected Complaint clarified the nature of relief being requested and identified the total amount of indebtedness Beach Commercial claims is owed by Matkins.

the sale of six invoices. *Id*. at paras. 15-16. The Complaint seeks to have the Court determine the amounts guaranteed by Matkins to be nondischargeable "(i) based upon false certifications or representations or based upon actual fraud . . . within the scope of 11 U.S.C. § 523(a)(2)(A); (ii) based upon fraud or defalcation committed while acting in a fiduciary capacity, within the scope of 11 U.S.C. § 523(a)(4); and/or (iii) based upon embezzlement or larceny, also pursuant to 11 U.S.C. § 523(a)(4)." *Id*. at preamble.

According to Beach Commercial, Matkins made false representations or committed actual fraud under 11 U.S.C. § 523(a)(2)(A) when he, on behalf of Bay Rivers, falsely represented to Beach Commercial that Huntington Ingalls Industries had received goods listed on three invoices from Bay Rivers (the "Huntington Ingalls Invoices"). *Id*. at paras. 17, 21. Beach Commercial asserts that it relied on these representations when it purchased the three invoices, which Matkins knew were invalid at the time of sale. *Id.* at paras. 19-20, 34-35. Beach Commercial also argues that Matkins committed actual fraud when he deposited a check from Glotech, Inc. ("Glotech Check"), which paid for three other invoices purchased by Beach Commercial, and spent those proceeds without informing Beach Commercial. *See id*. at paras. 23, 25-27, 37.

Next, Beach Commercial argues that Matkins committed fiduciary defalcation because, as president and part-owner of Bay Rivers, he is liable for selling invoices for goods that Bay Rivers never delivered, as well as failing to inform Beach Commercial that he deposited the Glotech Check. *Id*. at paras. 41-43. Beach Commercial argues that such action was done knowingly or with gross recklessness, and all debt resulting from these actions should be determined to be nondischargeable pursuant to 11 U.S.C. § 523(a)(4). *Id*. at para. 44.

Finally, Beach Commercial argues that Matkins's conduct constitutes embezzlement pursuant to 11 U.S.C. § 523(a)(4) and Virginia Code § 18.2-111 because he converted Beach Commercial's property for his own use without consent. *Id*. at para. 46. Beach Commercial also asks the Court to find that Matkins committed larceny if the Court finds that Matkins's intentional conduct was without Beach Commercial's initial consent. *Id*. at para. 47.

The Complaint asserts that the total nondischargeable debt owed to Beach Commercial is $191,097.55. *Id*. at prayer para. iv. This sum includes a 1% late fee; 3% interest on the Huntington Ingalls Invoices, calculated to be $8,463.67; $2,249.54 in interest, at 3%, on the invoices related to the Glotech Check; and $10,583.50 in attorney fees through April 13, 2018. *Id*. at paras. 28-29.

Matkins filed an Answer to the Complaint on May 17, 2018, admitting that some amount of money is owed to Beach Commercial but denying that the debt is nondischargeable. Answer to Complaint, Adv. Proc. No. 18-05007-SCS, ECF No. 7 (hereinafter, "Answer"), at para. 22. Matkins admits that he did not review every document submitted with the invoices sold to Beach Commercial. *Id*. at paras. 18, 19. He also asserts that he believed Bay Rivers was waiting on items from a third-party vendor before Bay Rivers could ship the products listed in the Huntington Ingalls Invoices that were sold to Beach Commercial. *Id*. at para. 21. Matkins admits he received and deposited the Glotech Check and that the funds were never remitted to Beach Commercial. *Id*. at paras. 25-26. However, he denies that he acted with gross recklessness or with intent to commit fraud or defalcation; that he owed a fiduciary duty to Beach Commercial; or that his actions constitute embezzlement or larceny. *See id*. at paras. 27, 37, 40-43, 46-47. Matkins argues instead that Beach Commercial was fully aware of Bay Rivers' financial issues

and thus could not justifiably rely on Bay Rivers' certifications and representations. *Id*. at para. 20. Matkins prays that the Court dismiss the Complaint. *Id*. at prayer.

Several evidentiary pleadings were filed prior to the trial. Beach Commercial filed a Motion in Limine to Exclude Certain Testimony and Narrow Issues at Trial ("Motion in Limine") on February 4, 2019. Motion in Limine to Exclude Certain Testimony and Narrow Issues at Trial, Adv. Proc. No. 18-05007-SCS, ECF No. 30 (hereinafter, "Motion in Limine"). Citing several examples of delays and unclear responses to discovery requests, Beach Commercial asked the Court to prohibit Matkins from presenting evidence concerning actions related to the sale of the Huntington Ingalls Invoices.[2] *Id*. at para. 25(a). Beach Commercial also requested that the Court conclusively establish that Matkins and/or another Bay Rivers employee knew that the items on the Huntington Ingalls Invoices would not be delivered until a date that was after those invoices were sold to Beach Commercial and to admit a deposition Beach Commercial took due to the denials of knowledge by a Bay Rivers employee. *Id*. at para. 25(b).

In response, Matkins argued that he complied with all discovery requests in good faith and provided all responses, documents, and testimony that he believed was relevant. Response to Motion in Limine, Adv. Proc. 18-05007-SCS, ECF No. 40, at paras. 2-3, 7. Matkins argued that he did not control the other deponents' unclear responses and that Beach Commercial was attempting to circumvent the Court's role as trier of fact. *Id*. at paras. 3, 6. Matkins prayed that the Court deny the Motion in Limine. *Id*. at prayer.

---

[2] Specifically, Beach Commercial asked the Court to exclude evidence related to who Matkins relied on to prepare the Huntington Ingalls Invoices; and contentions that Matkins was hampered in verifying (1) the validity of the Huntington Ingalls Invoices; (2) information provided to Beach Commercial when the Huntington Ingalls Invoices were sold to it; and (3) the delivery date for the items on the Huntington Ingalls Invoices. *See* Motion in Limine, at para. 25.

Beach Commercial and Matkins each lodged several evidentiary objections on February 5, 2019, which the parties noted at trial had been resolved. *See* Transcript of Feb. 12, 2019 Trial, at 6-8 (hereinafter, "Tr."). Additionally, on February 7, 2019, the parties filed a proposed agreed Order on Stipulation of Facts and Exhibits ("Stipulation").[3] Proposed Order on Stipulation of Facts and Exhibits, Adv. Proc. No. 18-05007-SCS, ECF No. 35 (hereinafter, "Stipulation").

At trial, at the request of the parties, the Court determined that the Motion in Limine would be considered after the case was presented.[4] *See* Tr. 3-5. Exhibits 1-28 and 30-31 tendered by Beach Commercial and Exhibits A and B tendered by Matkins were admitted without objection. *See id.* 8, 61, 80, 97-98, 102, 181. Following the trial, at the direction of the Court, the parties submitted an agreed Order on Deferred Consideration of Attorney's Fees/Expenses, which the Court entered on February 14, 2019. Under the order, Beach Commercial and Matkins agreed that if the Court rendered judgment in favor of Beach Commercial, Beach Commercial would have twenty-one (21) days to either submit a consent order regarding attorney fees or request the Court schedule a hearing to determine the amount of attorney fees Matkins owes Beach Commercial, and whether to admit Plaintiff's Exhibit 29 as well as any replacement or supplemental submissions by the parties.

---

[3] While the Stipulation largely restated facts alleged in the Complaint and Answer, two revelations were contained therein. First, BB&T maintained a first priority lien on Bay Rivers' accounts, contract rights, and general intangibles, which required BB&T to sign a subordination agreement before Bay Rivers could sell invoices to Beach Commercial. Proposed Order on Stipulation of Facts and Exhibits, Adv. Proc. No. 18-05007-SCS, ECF No. 35, at para. 6. Second, vendor GeoQuip halted its work on items needed by Bay Rivers to fulfill the order related to the Huntington Ingalls Invoices and placed a credit hold on Bay Rivers that was never lifted. *Id.* at para. 11.

[4] For reasons stated later in this Opinion, the Motion in Limine is moot.

## II. FINDINGS OF FACT

Much of the factual history is uncontested. Matkins was the president and part owner of Bay Rivers Industrial, Inc. ("Bay Rivers"), a machining, welding, and metal fabrication company located in Toano, Virginia. *Id.* at 104, 106-07; *see* Pl.'s Ex. 1 (Beach Commercial Application dated Feb. 6, 2017). Matkins formed Bay Rivers in 2013 after working for many years in the shipbuilding and machining industries. Tr. 104-05, 132-33. Matkins served as Bay Rivers' only officer and on-site director and had the final approval for hiring, business process procedures, and implementation. *See id.* at 133-35; Stipulation, at para. 1.

Starting from just a "folding table and a laptop," Matkins wanted to grow Bay Rivers and compete with other companies in the industry. Tr. 105-06. To do so, Matkins needed funding in addition to the capital Bay Rivers raised from its twenty initial investors (which included Matkins). *Id.* at 106. Bay Rivers received a revolving $100,000.00 line of credit from Old Point National Bank, which was later increased after additional capital investment was received. *Id.* at 108. Bay Rivers grew quickly and by 2016 needed access to additional funds. *Id.* Bay Rivers eventually closed its line of credit with Old Point National Bank and obtained a new line of credit with BB&T. *Id.* at 108-09. In return, BB&T received a first priority lien on Bay Rivers' accounts, contract rights, and general intangibles. Stipulation, at para. 6.

By February 2017, Bay Rivers had about fifty employees, as well as an abundance of work and contracts, particularly with shipbuilder Huntington Ingalls Industries.[5] Tr. 104, 107-08, 110. Bay Rivers' rapid expansion caused it to outgrow its available capital, and by 2018 it owed approximately $1.2 million to BB&T. *Id.* at 19, 110. In addition, large orders coupled with cash

---

[5] Matkins estimated that contracts with Huntington Ingalls Industries comprised 98% to 99% of Bay Rivers' work. Tr. 107.

flow and staffing issues delayed order completion. *Id*. at 110.[6] When Matkins requested that BB&T increase Bay Rivers' line of credit to enable the company to buy more materials to meet demand, BB&T refused to do so unless Bay Rivers received more shareholder investment. *Id*. As an alternative funding source, BB&T loan officer Al Roosendaal referred Matkins to Jeff Richardson ("Richardson"), president and founder of Beach Commercial.[7] *Id*. at 11, 109; *see* Pl.'s Ex. 16, at 5 (Email from Jeff Richardson to Ken Matkins dated Feb. 3, 2017, at 11:27 AM).

Beach Commercial provides financing to businesses with cash flow issues by "factoring," or purchasing, outstanding invoices at a discounted rate. Tr. 45-46, 48; Stipulation, at paras. 2-3. Many of Beach Commercial's customers are obtained through referrals from banks whose clients have exhausted financing options and are seeking additional sources of funding.[8] Tr. 11-12, 14, 45. When Roosendaal contacted Richardson to ask if Beach Commercial was interested in helping Bay Rivers with its funding issues, he gave Bay Rivers "a glowing reference." *Id*. at 12, 55.

On February 7, 2017, after reviewing Bay Rivers' application that was submitted the previous day, Beach Commercial approved Bay Rivers as a customer.[9] Pl.'s Ex. 16, at 2 (Email

---

[6] Specifically, Bay Rivers' plant manager suffered health issues, and Bay Rivers experienced delays producing parts ordered for the construction of an aircraft carrier. Tr. 110-11.

[7] Matkins was first introduced to Richardson in 2014 by Ben Bleicken, a financial consultant. Pl.'s Ex. 15, at 3-4 (Email from Ben Bleicken to Jeff Richardson dated July 23, 2014, at 1:28 PM).

[8] Richardson testified that 95% of Beach Commercial's business originates from bank referrals. Tr. 12. At the time, 10 to 15 percent of Beach Commercial's referrals came from BB&T, and less than 10% of its factoring agreements were made with firms involved in the shipbuilding industry. *Id*. at 44-45.

[9] On its February 2017 application to Beach Commercial, Bay Rivers disclosed that it had net losses of $92,926.00 in 2015 and $56,745.00 in 2016. It held approximately $720,000.00 in accounts receivable and owed $668,000.00 in accounts payable. Pl.'s Ex. 1, at 1. A balance sheet supplied to Beach Commercial indicated Bay Rivers owed $1.2 million to BB&T. Tr. 19. Matkins also represented on the application that no officer or stockholder had filed for bankruptcy (*see* Pl.'s Ex. 1, at 2), even though Matkins had filed for bankruptcy in the past. Tr.

from Jeff Richardson to Ken Matkins and Al Roosendaal dated Feb. 7, 2017, at 4:32 PM); *see*

*also* Pl.'s Ex. 1. Matkins and Richardson met the next day with BB&T officers to review the

factoring agreement's key terms.[10] Tr. 19, 112-13; Pl.'s Ex. 16, at 2. At the time, Matkins was

generally familiar with the factoring process, having spoken with Richardson and reviewed his

follow-up email about the arrangement on February 3, 2017, prior to transmitting the application

to Beach Commercial on February 6, 2017. Tr. 112, 137; *see* Pl.'s Ex. 16, at 4-6 (Email

exchanges between Richardson and Matkins following the Feb. 3, 2017 meeting). Richardson

testified that during the February 8, 2017 meeting, he reviewed the factoring agreement line by

line with Matkins for approximately 30 to 45 minutes and explained that Bay Rivers could sell

invoices to Beach Commercial on a voluntary basis. *See* Tr. 49-51. Matkins disputes

Richardson's account of the meeting, recounting that they discussed parts of the agreement but

did not review it line by line. *Id.* at 113. Matkins did not review the terms of the documents with

a lawyer or a financial professional but did initial each page of the agreement at the meeting,

presumably indicating that he read and understood the agreement's contents. *Id.* at 19, 113, 144;

*see* Pl.'s Ex. 2, § 16 (Factoring Agreement dated Feb. 7, 2017) (hereinafter, "Factoring

Agreement").[11] At the end of the meeting, Matkins signed both the Factoring Agreement and a

Continuing Guaranty and Waiver.[12] Tr. 49-50, 113; *see* Pl.'s Ex. 2; Pl.'s Ex. 3 (Continuing

Guaranty and Waiver dated Feb. 7, 2017) (hereinafter, "Guaranty").

---

169. Matkins testified that he believed the answer on the application was accurate because no
officer or shareholder was currently in an active bankruptcy case. *Id.* at 170-71.

[10] BB&T officers Al Roosendaal and possibly Kate Craig were present at the meeting. Tr. 19, 50.

[11] Richardson and Matkins do agree that Matkins was not provided with a copy of the Factoring
Agreement prior to the February 8, 2017 meeting. Tr. 50, 113.

[12] While both the Factoring Agreement and the Continuing Guaranty and Waiver are dated
February 7, 2017, it is undisputed that both documents were signed on February 8, 2017. Pl.'s
Ex. 2, at 9; Pl.'s Ex. 3, at 4.

A. The Factoring Agreement and Guaranty

In the normal course of business, Bay Rivers issued invoices to its customers for their orders. Under the Factoring Agreement, if Bay Rivers needed funds before the customer paid an invoice, it could sell fulfilled but unpaid invoices to Beach Commercial.[13] Tr. 51; Stipulation, at para. 3; Pl.'s Ex. 2, §§ 1.4, 9.1. Beach Commercial would pay Bay Rivers 81% of an invoice's face value in exchange for complete ownership of all payments made by Bay Rivers' customer on the purchased invoice. Pl.'s Ex. 2, §§ 2.2, 2.5. Ownership and title of a sold invoice and the proceeds thereof passed to Beach Commercial once the initial 81% payment was made. *Id.* §§ 2.5; 3.9. If Beach Commercial received the customer's payment within thirty days of purchasing an invoice, Bay Rivers would receive a second payment equivalent to 17.75% of the invoice's face value. *Id.* § 2.6.[14] Beach Commercial retained 1.25% of the invoice's face value. *Id.*; *see also* Tr. 48. The retained percentage increased by 0.25% roughly every seven days if an invoice's payment was received more than thirty days from its purchase date. Pl.'s Ex. 2, § 2.6; Pl.'s Ex. 16, at 6.

Each time Bay Rivers offered invoices for sale to Beach Commercial, the Factoring Agreement required Bay Rivers to submit a signed copy of its customer's contract or purchase order, a copy of the original invoice, an Authorization to Sell form executed by Matkins, and a subordination agreement executed by BB&T.[15] Pl.'s Ex. 2, §§ 1.4, 6.1; *see also* Tr. 17. The

---

[13] The Factoring Agreement required that each invoice Bay Rivers sold to Beach Commercial be "an accurate and undisputed statement" of what its customer owed. Pl.'s Ex. 2, § 9.1; *see also* Tr. 18.

[14] The amount of the initial and second payments by Beach Commercial on purchased invoices as set forth by Richardson in his email to Matkins on February 3, 2017, differs slightly (80% and 18.75%) from those contained in the Factoring Agreement (81% and 17.75%). Pl.'s Ex. 16, at 6. The Court finds the amounts contained in the Factoring Agreement to be controlling.

[15] Because BB&T held the primary lien on Bay Rivers' invoices, Bay Rivers had to obtain BB&T's endorsement of a subordination agreement before selling its invoices. Tr. 20;

Authorization to Sell form (hereinafter, "ATS Agreement") required a principal of Bay Rivers (specifically, Matkins) to make eight certifications by answering a series of questions about the invoices being sold and the financial health of Bay Rivers. *See* Tr. 27-29; Stipulation, at para. 5; *see also* Pl.'s Ex. 2, at 11. According to Richardson, Beach Commercial wanted Matkins to personally certify each representation on the ATS Agreement because Matkins had "direct knowledge" of the Factoring Agreement and the business. Tr. 28-29. The certifications on the ATS Agreement included that: (1) the customer had received the items listed on the invoices and was satisfied with their quantity and quality; (2) Bay Rivers did not owe any money to the customer; and (3) Bay Rivers understood that Beach Commercial was directly relying on the representations when buying the invoices. Pl.'s Ex. 2, at 11. If Bay Rivers made a false representation on an ATS Agreement, Beach Commercial was entitled to full recourse. *Id*. § 5.2.i; *see also* Tr. 16-17.

If a customer paid Bay Rivers for an invoice that had been sold to Beach Commercial, Bay Rivers was obligated to promptly send those funds to Beach Commercial via wire transfer or hand delivery; until such delivery, Bay Rivers was required to hold the money in trust. Pl.'s Ex. 2, §§ 3.2, 3.6, 3.7. Check payments could not be deposited into Bay Rivers' bank account. *Id*. § 3.1; *see also* Tr. 16. If a customer paid its invoice by electronic payment to Bay Rivers' bank account, Bay Rivers was required to notify Beach Commercial within twenty-four hours, as well as email a copy of the payment advice and a screenshot of the electronic deposit to enable Beach Commercial's initiation of a debit from Bay Rivers' account. Pl.'s Ex. 2, § 3.3. The deposit of a paper payment check or failure to timely notify Beach Commercial about an electronic payment constituted a default under the Factoring Agreement. *Id*. §§ 10.1.a, 10.1.b.

---

Stipulation, at para. 6. If BB&T consented, it would subordinate its lien to that held by Beach Commercial. Tr. 20; Stipulation, at para. 6.

Simultaneous with the signing of the Factoring Agreement, Matkins also signed a Guaranty, by which he personally and individually pledged full payment and performance of Bay Rivers' obligations arising under the Factoring Agreement. *See* Pl.'s Ex. 3; *see also* Tr. 113. Matkins further represented that he was completely familiar with Bay Rivers and its economic condition and promised to remain so in the future. Pl.'s. Ex. 3, para. 5. Matkins's alleged indebtedness to Beach Commercial arises under the Guaranty. *See* Stipulation, at para. 7.

### B. Bay Rivers' Invoice Factoring Process

Each week, Bay Rivers' employees held a meeting to discuss the status of production and shipment of items. Tr. 116, 138; Pl.'s Ex. 28, at 43-44 (Excerpts of Jan. 18, 2019 Deposition of Benjamin Bleicken). Meeting attendance varied depending on each employee's role and the orders that were in process. Tr. 116-17. Matkins and Shelley Arthur, Bay Rivers' bookkeeper, were present for some, but not all, meetings. *Id*. at 85, 116-17. After a production meeting, a list of invoices for potential sale would be delivered to either Matkins or Arthur. *Id*. at 88, 117, 138, 140. If Matkins received the list, he reviewed and selected invoices for goods that either had shipped or were going to ship to the customer within one week and provided a list of the selected invoices to Arthur. *Id*. at 138-40.

Using the list supplied to her, Arthur would generate the invoices to offer for sale to Beach Commercial.[16] *Id*. at 88, 95; *see also id*. at 138. Contrary to Beach Commercial's

---

[16] The information used to create invoices was assembled from packing lists included with customer orders. Tr. 71-72 (testimony of Amanda McLendon, Production Controller at Bay Rivers from Dec. 2013 through Sept. 2017). Packing lists were either electronic (on Bay Rivers' internal system) or in physical, paper form. *Id*. at 72. Invoices were generated from the QuickBooks computer program once the information from the packing lists was synced with QuickBooks. *Id.*; *see also id.* at 88.

expectation, Arthur also completed the ATS Agreement,[17] answering the questions thereon with the same responses as appeared on earlier forms. *See id.* at 29, 87-89, 94, 138, 145. With Matkins's authorization, Arthur affixed Matkins's signature using his signature stamp. *Id.* at 87-89, 94-95, 145; *see also id.* at 114.[18] Arthur testified that she then reviewed the ATS Agreements with Matkins "[e]ither in conversation or in person." *Id.* at 88-89, 94-95. Matkins's testimony differs slightly on this point, indicating that he did not review everything stamped with his signature. *Id.* at 116. Beach Commercial was unaware that Matkins delegated completion of the ATS Agreements to an employee and did not become aware of the signature stamp's use until December 2018. *Id.* at 29-30. Had Richardson known that Matkins was using a signature stamp, Beach Commercial would not have purchased the invoices at issue. *Id.* at 28-29.

Arthur was responsible for sending the completed ATS Agreements and the associated list of invoices to Beach Commercial, understanding that the items on the invoices had shipped or were shipping that week.[19] *Id.* at 88-89. According to Matkins, Arthur likely did not check the status of shipments corresponding with invoices being offered for sale to Beach Commercial. *Id.* at 146-47. Arthur copied Matkins on all emails when she submitted ATS Agreements to Beach Commercial. *Id.* at 95. Arthur served as Bay Rivers' primary point of contact with Beach

---

[17] According to Arthur, she completed most of the ATS Agreements submitted to Beach Commercial. Tr. 87. Matkins corroborated this statement, testifying that the only ATS Agreement he personally completed was the first one. *Id.* at 138.

[18] Matkins testified that the signature stamp was procured in late 2014 or early 2015 to keep up with the large volume of items requiring his signature. Tr. 115. Matkins allowed anyone to use the signature stamp who required it, but the stamp was primarily used by Arthur, who kept it at her desk. *Id.* at 87, 116, 135-36. Bay Rivers employee Benjamin Bleicken testified that he was unaware of the signature stamp's existence and would not have endorsed its use or retention. Pl's Ex. 28, at 28, 55-56.

[19] Arthur's other duties included logging invoice payments, reviewing bank statements, and performing bank account reconciliation. *See* Tr. 85-86, 90-93. If a payment came in the form of a check, Arthur would typically receive it and either put the check on Matkins's desk or give it to someone to deposit in the bank. *Id.* at 95-96, 161.

Commercial regarding sold invoices until that duty was shifted to other Bay Rivers' personnel. *Id*. at 33-34.

### C. Bay Rivers' Financial Condition During the Factoring Relationship

Despite entering into the Factoring Agreement to remedy their cash flow problems, Bay Rivers continued to experience issues with available cash, which eventually led it to overdraw its account with BB&T early in the summer of 2017. *Id.* at 142, 151. By June 27, 2017, Bay Rivers had several checks returned due to insufficient funds and had incurred hundreds of dollars of overdraft fees. *Id*. at 22; *see* Pl.'s Ex. 11, at 9-11 (BB&T Bank Statements for Bay Rivers Industrial Inc., dated May 2017 through Aug. 2017). BB&T notified Bay Rivers of its overdraft status and eventually began to charge Bay Rivers additional fees, which were automatically withdrawn from their account. Tr. 125, 141-42; *see generally* Pl.'s Ex. 11.

Beach Commercial was aware of Bay Rivers' overdraft position from conversations with both Bay Rivers and BB&T. *See* Tr. 21 ("[Bay Rivers] would often call or send emails saying that they were overdrawn and that they had to have money by a certain time, otherwise the bank was going to return checks."); *see also id.* at 22, 52. Beach Commercial continued to work with Bay Rivers during this time period because the overdraft issues did not affect the credit quality of the invoices being purchased.[20] *Id*. at 23. Furthermore, bank overdrafts were often a sign of tight cash flow, which Bay Rivers could cure by selling invoices to Beach Commercial. *Id.*; *see also*

---

[20] It appears that most of the factoring transactions between Beach Commercial and Bay Rivers occurred without any issues. At trial, Matkins testified that he was initially going to sell invoices under the Factoring Agreement through June 2017 but continued to do so through mid-August 2017. Tr. 144. According to the Complaint, the aggregate face value of the invoices Bay Rivers sold to Beach Commercial was $1,872,616.84. Complaint, at para 12. Between February 7, 2017, and August 31, 2017, Beach Commercial had received $1,606,709.05 in payments, and $265,907.79 remained due. Complaint, at paras. 13-14.

*id*. at 53. Still, because of the overdrafts, Beach Commercial remained in frequent contact with

BB&T. *Id.* at 46-47.

In late June or early July 2017, Bay Rivers' board of directors hired Ben Bleicken

("Bleicken") to serve as financial consultant. Pl.'s. Ex. 28, at 14-15. While Bleicken testified that

he did not serve as an officer, director, shareholder, or owner of the company, Matkins believed

Bleicken was Bay Rivers' chief financial officer, whose role in the company was equal to his,

with Bleicken focusing on financial matters and Matkins working on production. *Compare id*. at

14-15, *with* Tr. 126. Matkins and Bleicken agree that Bleicken was charged with improving

financial and operational processes, obtaining additional capital, and repairing Bay Rivers' cash

flow issues. Tr. 126-27; Pl.'s. Ex. 28, at 15-16. Bleicken worked to create a cash forecasting

model and interfaced with investors and BB&T. Pl.'s Ex. 28, at 29, 45. Bleicken also served as

Bay Rivers' point of contact with Beach Commercial after July 6, 2017. Tr. 31; *see* Pl.'s Ex. 19

(Email from Ken Matkins to Jeff Richardson dated July 6, 2017, at 8:41 AM). Bleicken was not

involved in the process of selling invoices. Pl.'s. Ex. 28, at 39, 45. If Bleicken needed

information concerning finances and invoices, he communicated with Arthur. *Id*. at 39, 110.

During July and August 2017, Matkins and Bleicken met with BB&T to negotiate a

resolution of their funding issues. Tr. 127-28. BB&T indicated its willingness to increase Bay

Rivers' line of credit if $250,000.00 in additional capital was gathered from its shareholders. *Id*.

By late July or early August, Bay Rivers' investors successfully raised the required amount, and

based upon his prior conversations with BB&T, Matkins believed an increase to Bay Rivers' line

of credit was imminent. *Id*. Bleicken and Matkins then crafted a plan to resolve their cash flow

shortages. *Id*. at 128-29. In early August, officers from BB&T met with Matkins, Bleicken, and

at least two members of Bay Rivers' board of directors. *Id*. at 129. BB&T's officers listened to

Bay Rivers' resolution plan but nonetheless advised Matkins and Bleicken that BB&T would not increase Bay Rivers' credit line unless the shareholders made additional contributions to Bay Rivers. *Id.*

By August 2017, BB&T's fees and collection efforts were causing enormous financial stress for Bay Rivers; according to Bleicken, BB&T was debiting all cash out of Bay Rivers' account. Pl.'s Ex. 28, at 88; *see also* Tr. 164. Bleicken and Matkins began looking for new investors as well as potential purchasers for the company. Tr. 126-27; Pl.'s Ex. 28, at 90. They also consulted bankruptcy attorneys to explore various options for Bay Rivers' future. Pl.'s Ex. 28, at 62-63.

### D. The Huntington Ingalls Invoices

In the midst of the aforesaid events, Bay Rivers continued to offer invoices for sale to Beach Commercial, including invoices related to an order placed by Huntington Ingalls Industries. *See* Tr. 25-26, 144. In May 2017, Huntington Ingalls placed an order with Bay Rivers for 340 product items, as reflected by three invoices generated by Bay Rivers ("Huntington Ingalls Invoices").[21] Pl.'s Ex. 8 (Invoices from Bay Rivers Industrial Inc. to Huntington Ingalls Industries dated June 26, 2017, and June 27, 2017); *see also* Tr. 25. While comparable to other orders, Bay Rivers lacked the necessary equipment to fulfill the order. Tr. 118-19. Bay Rivers therefore subcontracted the work to third-party vendor GeoQuip. *Id.* at 118. Matkins had a "long working relationship with [GeoQuip]," and Bay Rivers placed orders with the company roughly once per month. *Id.*; Pl.'s Ex. 31, at 8-9 (Feb. 6, 2019 Deposition of Todd R. Szydlik).

---

[21] The three invoices issued to Huntington Ingalls bear the face values of $21,260.37; $46,408.05; and $67,210.72, for a total face value of $134,879.14. Pl.'s Ex. 8; Pl.'s Ex. 9 (Authorization to Sell dated June 27, 2017, and attached list of invoices).

Bay Rivers received a price quote for the subcontracted order from GeoQuip on May 24, 2017, and ordered the items needed to fulfill Huntington Ingalls' order on May 31, 2017. Pl.'s Ex. 4 (Quote from GeoQuip dated May 24, 2017); Pl.'s Ex. 5 (Purchase Order from Bay Rivers Industrial, Inc. to GeoQuip dated May 31, 2017); *see also* Tr. 69, 148-49. As reflected by the purchase order, Bay Rivers requested delivery of the items by July 5, 2017.[22] Tr. 149; Pl.'s Ex. 5; Pl.'s Ex. 31, at 24-25. While Matkins testified that he later became aware that Bay Rivers had subcontracted the job to GeoQuip, Bay Rivers' Production Controller Amanda McClendon testified that because of the order's size, Matkins had to approve the order with GeoQuip due to the dollar amount, which exceeded $158,000.00. *Compare* Tr. 70-71, *with id.* at 119.

The items for the Huntington Ingalls order was the largest single purchase order GeoQuip received from Bay Rivers.[23] Pl.'s Ex. 31, at 19-20. Due to its size, GeoQuip's vice president and general manager, Todd Szydlik ("Szydlik"), had to personally approve the order. *Id.* at 7, 18. While not considered complicated, given the material and production requirements,[24] GeoQuip estimated that the Huntington Ingalls order would take six weeks to complete, that it could not be

---

[22] A review and comparison of GeoQuip's quote, Bay Rivers' purchase order, and the Huntington Ingalls Invoices reveals that Bay Rivers' May 31, 2017 order with GeoQuip was for more items than just those reflected on the Huntington Ingalls Invoices. *Compare* Pl.'s Ex. 4 *and* Pl.'s Ex. 5, *with* Pl.'s Ex. 8.

[23] According to McClendon, the typical order size Bay Rivers received from its customers was $3,000.00 to $5,000.00. Tr. 70. The Huntington Ingalls order exceeded $134,000.00. *Id.*; Pl.'s Ex. 8. The typical size of orders Bay Rivers placed with GeoQuip was $10,000.00 to $20,000.00. Pl.'s Ex. 31, at 19. The order placed with GeoQuip on May 31, 2017, exceeded $158,000.00. Tr. 70; Pl.'s Ex. 5; Pl.'s Ex. 31, at 19.

[24] The order required special production needs, such as annealing and laser cutting the material. Pl.'s. Ex. 31, at 15. The order also required aluminum, which GeoQuip had to procure from its supplier. *Id.*

finished earlier, and that it would be difficult to finish by Bay Rivers' desired July 5, 2017 completion date.[25] *Id.* at 15, 25, 26, 29, 32.

Matkins testified that when he became aware that Bay Rivers had subcontracted the Huntington Ingalls order to GeoQuip, he contacted Szydlik to ensure the order would be delivered, as Matkins thought Bay Rivers was on a "credit hold" with GeoQuip. Tr. 119, 152-53.[26] Matkins asserts that Szydlik confirmed the order would be fulfilled "that week," even though Matkins had to convince Szydlik to do so because Bay Rivers had a prior outstanding balance with GeoQuip.[27] *Id.* at 119, 153. According to Matkins, GeoQuip was going to deliver the product knowing that Bay Rivers was unable to pay them. *Id.* at 160. Matkins testified that, at the time, Bay Rivers was expecting an influx of $750,000.00 in cash, and thus Matkins did not think paying the GeoQuip debt would be problematic. *Id.* at 157, 159. Matkins believed the order would be shipped approximately eight days earlier than the requested July 5, 2017 due date based upon his conversation with Szydlik. *See id.* at 120, 122, 153, 155-56, 160. *But see id.* at 119 (testimony by Matkins that he was unaware of the progress of the order placed with GeoQuip).

Szydlik's account of his communications with Matkins regarding the May 31, 2017 order differs in some respects. Szydlik testified that he, not Matkins, initiated discussions about the order with Matkins at Bay Rivers' facility in early June. *See* Pl.'s Ex. 31, at 16-18. Sometime between June 10 and 15, 2017, Szydlik advised Matkins in person that GeoQuip was not going to receive the needed materials until June 20, 2017, and thus completing the order by July 5, 2017,

---

[25] Szydlik testified that Matkins was aware of the labor requirements to complete the order. *See* Pl.'s Ex. 31, at 26-27.
[26] Per the terms of the purchase order, Bay Rivers was not required to pay for the order until GeoQuip completed the work and shipped the products. Pl.'s Ex. 5; Pl.'s Ex. 31, at 28.
[27] Szydlik also handled credit management duties at GeoQuip. Pl.'s Ex. 31, at 12.

would be difficult. *Id*. at 26-27, 31-32. Matkins did not recall Szydlik making these statements. Tr. 154. Szydlik also informed Matkins that Bay Rivers owed GeoQuip a significant sum of money, and Bay Rivers needed to make a payment[28] by early July 2017 because GeoQuip was not going to extend further credit to Bay Rivers. *Id*. at 157; Pl.'s Ex. 31, at 31, 34, 36-37. Matkins acknowledged that Bay Rivers owed money to GeoQuip and explained that Bay Rivers was obtaining bank financing, which would be used to pay GeoQuip. Tr. 157, 159; Pl.'s Ex. 31, at 34-35. Szydlik denies ever discussing an earlier delivery date with Matkins, asserting such a short turnaround have been impossible given the material and labor requirements. Pl.'s Ex. 31, at 29-31; *see also id.* at 32-33.[29] Both Matkins and Szydlik agree that GeoQuip did not ship the order because Bay Rivers did not make a payment on its account. Tr. at 120, 158; Pl's Ex. 31, at 36-37.

Despite the order being unfulfilled, Bay Rivers offered to sell the Huntington Ingalls Invoices, with a face value of $134,879.14, to Beach Commercial. Tr. 25-26, 122-23; Pl.'s Ex. 8. On June 27, 2017, Bay Rivers sent Beach Commercial an ATS Agreement listing, among others, the Huntington Ingalls Invoices. *See* Pl.'s Ex. 9 (Authorization to Sell dated June 27, 2017, and attached list of invoices); *see also* Pl.'s Ex. 18, at 10 (Email from Lisa Reed at Beach Commercial to Kate Craig at BB&T dated June 27, 2017, at 3:02 PM) (requesting BB&T sign a subordination agreement for the invoices). Matkins testified that Arthur would have sent the ATS Agreement on behalf of Bay Rivers. Tr. 147. On June 28, 2017, BB&T approved the subordination of its lien on the invoices. Pl.'s Ex. 18, at 1-4 (Email exchange between Kathryn

---

[28] According to Matkins, during a later conversation, Szydlik informed him that, unless Bay Rivers made a payment between $80,000.00 and $100,000.00, GeoQuip would not ship the items on the May 31, 2017 purchase order. Tr. 157.

[29] GeoQuip never received a request from Bay Rivers to expedite production of the items in the order. Pl.'s Ex. 31, at 26. If the delivery date had changed, Szydlik would have been notified, and GeoQuip would have amended the purchase order. *Id*. at 24, 30.

Craig and Lisa Reed re: BB&T's consent to Beach Commercial's purchase of Huntington Ingalls Invoices dated June 27-28, 2017); *see also* Tr. 63. Beach Commercial paid Bay Rivers the 81% down payment for the invoices the same day. Pl.'s Ex. 10 (Down payment Report and Wire Confirmation for Huntington Ingalls Invoices dated June 28, 2017); *see also* Tr. 26.

The ATS Agreement for the Huntington Ingalls Invoices, which exhibited Matkins's signature, contained representations that Huntington Ingalls had already received the goods listed on the invoices and was satisfied with the quantity and quality of the items.[30] Pl's Ex. 9. These representations were made despite the items not having been shipped. Tr. 27, 158; *see also* Def.'s. Ex. B (Email from Walt Harrell to Kristen Shafer dated July 6, 2017, at 2:56 PM). At trial, Matkins admitted that the representations on the ATS Agreement were inaccurate. Tr. 147-48. Had he known that Huntington Ingalls had not received the product, Richardson testified he would not have purchased the invoices. *Id*. at 30-34.

By early July 2017, GeoQuip still planned to fulfill the order despite production difficulties. Pl.'s Ex. 31, at 10, 38; Def.'s. Ex. B. Walt Harrell, GeoQuip's production manager, communicated to Bay Rivers employee Kristen Shafer that partial quantities of the items would ship to Bay Rivers beginning July 10, 2017, and every 2 days thereafter. Def.'s. Ex. B; *see also* Pl.'s Ex. 31, at 38. Even after Bay Rivers received this email, Matkins did not inform Beach Commercial that the GeoQuip order had not been received and the Huntington Ingalls order had not been fulfilled. *See* Tr. 178, 180.

---

[30] The same ATS Agreement represented that Bay Rivers was current on all note payments to its bank. Pl.'s Ex. 9. At the time, Matkins stated that BB&T was withdrawing money from Bay Rivers' account to compensate for overdrafts and other amounts owed to them. Tr. 150-51. Matkins testified that he believed Bay Rivers was still in good standing because BB&T was working with Bay Rivers as it attempted to resolve its cash flow problem. *Id*. at 151-52.

When Bay Rivers failed to deliver a payment to GeoQuip by early July 2017, Szydlik instituted a credit hold and refused to deliver any items already produced.[31] *See* Pl.'s Ex. 31, at 36-40. Szydlik testified that he left two voicemail messages for Matkins around July 8, 2017, but Matkins did not return his call until a few days later, at which point Szydlik informed him about the credit hold and that GeoQuip could not ship the items.[32] Tr. 120; Pl.'s Ex. 31, at 42-43. According to Matkins, he thought GeoQuip had already shipped the items and called Szydlik after learning that the Huntington Ingalls orders appeared on a production list as not being shipped. Tr. 120-21. Matkins advised Szydlik that Bay Rivers would receive financing imminently, but Bay Rivers was experiencing problems finalizing the details. Pl.'s Ex. 31, at 43. Eventually, Bay Rivers realized it could not pay GeoQuip in full, and Bleicken so advised Szydlik. Pl.'s Ex. 28, at 61-62. Bay Rivers never paid the past due balance owed to GeoQuip, and GeoQuip never lifted its credit hold on Bay Rivers. Tr. 157-58; Pl's Ex. 31, at 48. The products listed on the invoices were never delivered to Bay Rivers, and Bay Rivers never delivered the items to Huntington Ingalls.[33] Tr. 148, 158; Pl.'s Ex. 31, at 36.

Beach Commercial was not made aware that Huntington Ingalls did not receive its order until mid-July 2017.[34] Tr. 34, 166. Matkins and Bleicken informed Richardson about the delay

---

[31] GeoQuip had produced 20% of the items when the credit hold was instituted and thus would have been unable to meet the July 5, 2017 deadline even if production had continued. Pl.'s Ex. 31, at 38-39, 41. According to Szydlik, had Bay Rivers delivered a check to GeoQuip by the beginning of July 2017, the order would have taken another week to complete. *Id.* at 44.

[32] GeoQuip informed Bay Rivers of the credit hold no later than July 14, 2017. Pl.'s Ex. 31, at 41-43.

[33] Bleicken testified that Bay Rivers was supposed to reverse an invoice sale if it discovered that the products listed on the invoice had not shipped. Pl.'s Ex. 28, at 79-80.

[34] The evidence is unclear as to the exact date Beach Commercial learned that the items ordered by Huntington Ingalls were never delivered. By July 21, 2017, Beach Commercial had not received any payments from Huntington Ingalls, and Richardson inquired if any payments were mistakenly sent to Bay Rivers. Pl.'s Ex. 20, at 1 (Email from Jeff Richardson to Ken Matkins, Ben Bleicken, and Shelly Arthur re: Huntington Ingalls payment status dated July 21, 2017, at

and offered for Beach Commercial to retain 100% of the face value of other invoices Bay Rivers was selling to remedy the problem. *Id*. at 166. Richardson told Bay Rivers to pay GeoQuip so that GeoQuip would complete and send the products to Huntington Ingalls. *Id*. at 34. In the meantime, Beach Commercial and Bay Rivers requested that Huntington Ingalls redirect all payments to Beach Commercial.[35] *Id*. at 56-57; *see also* Pl.'s Ex. 20, at 1 (Email from Jeff Richardson to Ken Matkins, Ben Bleicken, and Shelly Arthur re: Huntington Ingalls' payment status dated July 21, 2017, at 12:49 PM). Richardson sent another email on July 24, 2017, to Matkins, Bleicken, and Arthur asking that any incoming invoice payments be held in escrow while Huntington Ingalls completed rerouting their payments. Pl.'s Ex. 20, at 2.

By late August 2017, Beach Commercial had not received payments from Huntington Ingalls on at least two of the invoices purchased on June 28, 2017. *Compare* Pl.'s Ex. 20, at 11 (Email from Jeff Richardson regarding payments on Huntington Ingalls Invoices 11093 and 11094 dated Aug. 28, 2017, at 9:12 AM), *with* Pl.'s Ex. 9 *and* Pl.'s Ex 10 (indicating that Huntington Ingalls Invoices 11093 and 11094 were sold by Bay Rivers to Beach Commercial). In addition to regularly contacting Huntington Ingalls' accounts payable department to inquire about its payment schedule (Tr. 56-57), Beach Commercial requested updates on the invoices from Bay Rivers in multiple emails sent on August 22, 25, 28, and 29, 2017. *See* Pl.'s Ex. 20, at 8-14. Richardson emailed Arthur on August 22, 2017, asking if Huntington Ingalls ever gave Bay Rivers a receipt for delivered products. *Id*. at 8. Richardson emailed Arthur again on August

---

12:49 PM). Bleicken responded that some payments were mistakenly sent to Bay Rivers, *id*. at 2, 3 (Email from Ben Bleicken to Jeff Richardson dated July 24, 2017, at 11:10 AM), but it is unclear if these payments were related to the Huntington Ingalls Invoices.

[35] Beach Commercial later learned that Huntington Ingalls had rerouted its payments back to Bay Rivers, contrary to Beach Commercial's request. Tr. 41. Bay Rivers' Chesapeake Bank statement reveals that Huntington Ingalls paid Bay Rivers $1,292.60 on August 23, 2017; $20,920.61 on August 24, 2017; and $514.64 on August 29, 2017. Pl.'s Ex. 13, at 1 (Chesapeake Bank statement for Bay Rivers Industrial, Inc., for Aug. 18-30, 2017).

25, 2017, asking for estimated dates by which Huntington Ingalls was supposed to pay for two of the invoices attached to the June 27, 2017 ATS Agreement; he renewed his request on August 28, 2017. *Id*. at 10-11. According to Bleicken, Arthur became frustrated when dealing with the matter and did not respond to Richardson's emails due to unresponsiveness from Huntington Ingalls and numerous other priorities at Bay Rivers. Pl.'s Ex. 28, at 80-81. On August 29, 2017, when a Beach Commercial employee asked Arthur if Huntington Ingalls ever provided information about funds received by Bay Rivers for the payment of an invoice, Bleicken directed Beach Commercial to contact him about the invoice payments going forward. Tr. 32-33; Pl.'s Ex. 20, at 12-14; Pl.'s Ex. 28, at 73.

According to Bleicken, during late August 2017, priorities at Bay Rivers shifted from investigating missing invoice payments to finding money to pay employees and vendors. *See* Pl.'s Ex. 28, at 74, 81-84. Bleicken characterized Richardson's collection efforts during this time as "quite intense." *Id*. at 74. Richardson confirmed he frequently emailed and called Matkins, and when he failed to respond, Richardson visited Bay Rivers and Matkins's home during business hours. Tr. 60-61; *see also* Pl.'s Ex. 28, at 74. Bleicken described the daily environment at Bay Rivers as a "chaotic situation." Pl.'s Ex. 28, at 73.

On September 1, 2017, Bleicken advised Richardson via email that GeoQuip still had not delivered the products listed in two of the Huntington Ingalls Invoices.[36] Tr. 35; Pl.'s Ex. 23, at 1 (Email from Ben Bleicken to Jeff Richardson dated Sept. 1, 2017, at 4:12 PM). Richardson later texted Matkins to confirm that Huntington Ingalls had not paid the invoices because GeoQuip

---

[36] According to Richardson, this was the first written communication from Bleicken regarding the non-delivery of the products by GeoQuip. Tr. 35

had not shipped the items.[37] Pl.'s Ex. 23, at 4 (Email from Jeff Richardson dated Sept. 7, 2017, at

7:59 AM memorializing text message sent to Ken Matkins and Ben Bleicken on Sept. 7, 2017, at

7:45 AM). Richardson was "deeply troubled" that Bay Rivers sold the Huntington Ingalls

Invoices before the products were delivered. *Id*. at 5 (Email from Jeff Richardson to Ken

Matkins dated Sept. 7, 2017, at 10:25 AM). He stressed to Matkins the need to fulfill the

Huntington Ingalls order. *Id*. Beach Commercial never received payment on the Huntington

Ingalls Invoices. *See* Tr. 42.

### E. The Glotech Check

In addition to the Huntington Ingalls Invoices, Beach Commercial encountered collection

issues with purchased invoices issued to another Bay Rivers customer, Glotech, Inc. On June 8,

2017, Bay Rivers submitted an ATS Agreement and copies of three invoices previously issued to

customer Glotech for sale to Beach Commercial.[38] *Id*. at 23-24, 62; Pl.'s Ex. 6 (Three Glotech

invoices dated June 8, 2017); Pl.'s Ex. 17, at 6 (List of invoices offered for purchase by Bay

Rivers to Beach Commercial on June 8, 2017), 7 (Email from Shelley Arthur to Lisa Reed dated

June 8, 2017, at 3:18 PM). BB&T approved and executed a subordination agreement, and Beach

Commercial paid Bay Rivers the 81% down payment for the invoices the same day. Tr. 24; Pl.'s

Ex. 7 (Down payment Report and Wire Confirmation for Glotech invoices dated June 8, 2017);

Pl.'s Ex. 17, at 1-2 (Email from Kathryn Craig transmitting June 8, 2017 Subordination

Agreement); *see also* Tr. 62. By July 25, 2017, however, Beach Commercial had not received

any payments from Glotech and asked Bay Rivers for payment updates. Tr. 32, 167; *see, e.g.*,

Pl.'s Ex. 21, at 2 (Email from Jeff Richardson to Ben Bleicken and Shelley Arthur dated July 25,

---

[37] The text message was memorialized in an email Richardson sent to Beach Commercial
employees Lisa Reed and Beth Oglesby the same day. Pl.'s Ex. 23, at 4.
[38] The three invoices issued to Glotech bear the face values of $15,347.20, $6,856.30, and
$12,718.20. Pl.'s Ex. 6; Pl.'s Ex. 17, at 6.

2017, at 1:25 PM). Arthur responded that payment was expected any day. Pl.'s Ex. 21, at 1

(Email from Shelley Arthur to Jeff Richardson dated July 25, 2017, at 2:10 PM). Beach

Commercial continued asking Bay Rivers for updates, but Glotech did not issue a check for the

invoices until August 16, 2017 (hereinafter, "Glotech Check"). Tr. 31-32, 36; *see* Pl.'s Ex. 12

(Check from Glotech, Inc., to Bay Rivers Industrial Inc., dated Aug. 16, 2017); Pl.'s Ex. 21, at 7

(Email from Ben Bleicken to Jeff Richardson dated Aug. 10, 2017, at 9:43 AM), 8 (Email from

Jeff Richardson to Shelley Arthur dated Aug. 17, 2017, at 12:37 PM), 9 (Email from Jeff

Richardson to Shelley Arthur dated Aug. 9, 2017, at 1:39 PM); *see also* Tr. 38, 130; Pl.'s Ex. 28,

at 85.

Bay Rivers received the Glotech Check sometime between August 16 and August 21,

2017. Tr. 162. Instead of delivering the Glotech Check to Beach Commercial, on August 21,

2017, Matkins deposited it in an account he opened at Chesapeake Bank on August 18, 2017. *Id.*

at 39, 125, 130-31, 162-63; *see also* Pl's Ex. 13, at 1 (Chesapeake Bank statement for Bay Rivers

Industrial, Inc., for Aug. 18-30, 2017), 6 (Chesapeake Bank deposit ticket matching Glotech

Check amount of $34,921.70). Matkins knew that Beach Commercial owned the check and that

Richardson had asked about Glotech's payment multiple times, but he did not advise Beach

Commercial that he deposited the check until weeks later. Tr. at 37, 163-64. According to

Matkins, he did not open the Chesapeake Bank account with the intent to hide the Glotech Check

proceeds; instead, he used funds in that account, including the proceeds of the Glotech Check, to

pay Bay Rivers' bills because BB&T had restricted access to the account there. *Id.* at 125, 131,

164-65.[39] Because Bay Rivers soon needed the money to pay employees and cover production

---

[39] Bleicken also testified that "BB&T was . . . taking any payment that arrived in the BB&T account [,] . . . which was causing tremendous difficulties." Pl.'s Ex. 28, at 88. Bleicken suggested that Matkins open an account at a bank other than BB&T. *Id.* at 89, 97-98. Bleicken

costs, Matkins intended to pay Beach Commercial the amount listed on the Glotech Check from funds he expected to receive from shareholders and BB&T. *Id*. at 131, 165, 167-68.

By September 7, 2017, Richardson was emailing Bleicken daily for updates regarding payments on the Glotech invoices. *Id*. at 37; *see, e.g.*, Pl.'s Ex. 23, at 6 (Email from Jeff Richardson to Ben Bleicken dated Sept. 7, 2017, at 10:50 AM). Bleicken's testimony confirms that he and Bay Rivers "had been putting [Richardson] off for a while." Pl.'s Ex. 28, at 90; *see also id*. at 85, 87. Around this time, Matkins told Bleicken that he deposited the Glotech Check in the Chesapeake Bank account. *Id*. at 89-90, 95. Bleicken advised Matkins to reverse the deposit and thought Matkins eventually would do so. *Id*. at 93, 98-99. Bleicken testified that had he known earlier that the check was deposited into the Chesapeake Bank account, he would have advised Richardson. *See id*. at 95-97. Beach Commercial never received the proceeds of the Glotech Check. Tr. 42.

On September 12, 2017, Richardson, Matkins, and Bleicken met at a Starbucks in Williamsburg, Virginia, to discuss issues with invoice payments. *Id*. at 37. Matkins confessed that he received the Glotech Check, deposited it in the Chesapeake Bank account, and spent the money to pay his employees and buy materials. *Id*. at 36-38, 57, 166-67. Richardson told Matkins and Bleicken that Bay Rivers needed to "[d]o what they needed to do to get it right," and demanded a copy of the check, which Bleicken eventually sent. *Id*. at 38; Pl.'s Ex. 12.

### F. The Closure of Bay Rivers

Beach Commercial last purchased invoices from Bay Rivers on August 31, 2017. Tr. 36. Bay Rivers sent an ATS Agreement and a list of invoices to Beach Commercial on September 6,

---

credited the idea for a new bank account to a conversation he had with Richardson: "I thought maybe [Richardson] put the bug in my head to gain control of what was going on with this account rather than someone at BB&T." *Id*. at 98.

2017, but Beach Commercial refused to purchase them. *Id.* at 35-36; *see* Pl.'s Ex. 14 (Sept. 6, 2017 Authorization to Sell Agreement). On September 8, 2017, Richardson notified Bleicken that Beach Commercial would not purchase additional invoices from Bay Rivers. Pl.'s Ex. 21, at 11 (Email from Jeff Richardson to Ben Bleicken dated Sept. 8, 2017, at 1:58 PM). Matkins was unable to find additional funding sources or investors for the company, and by September 17, 2017, Bay Rivers could no longer pay its employees and ceased business operations. Tr. 132, 171-72. Matkins commenced his personal Chapter 7 case jointly with his wife on January 17, 2018. By April 2018, when the instant Complaint was filed, Beach Commercial asserts it was owed a combined $191,097.55 for the Huntington Ingalls Invoices and for the Glotech invoices paid for by the Glotech Check, plus related fees. Pl.'s Ex. 25 (Summary of damages).[40] Bay Rivers' corporate status was terminated on June 30, 2018. Pl.'s Ex. 26 (Jan. 17, 2019 Virginia State Corp. Comm'n Data Summary re: termination of Bay Rivers entity registration).

### III. CONCLUSIONS OF LAW

This Court has reviewed on many occasions the considerations to be weighed when determining whether a debt is nondischargeable under 11 U.S.C. § 523.

> One of the most important benefits of the Bankruptcy Code is its ability to offer debtors a fresh start. This concept of a fresh start demands that courts construe exceptions to discharge narrowly against the objecting creditor and in favor of the debtor. *Gleason v. Thaw*, 236 U.S. 558, 561-62 (1915); *Foley & Lardner v. Biondo* (*In re Biondo*), 180 F.3d 126, 130 (4th Cir. 1999) (citing *Century 21 Balfour Real Estate v. Menna* (*In re Menna*), 16 F.3d 7, 9 (1st Cir. 1994)); *Rezin v. Barr* (*In re Barr*), 194 B.R. 1009, 1016 (Bankr. N.D. Ill. 1996) (citing *Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 674 (7th Cir. 1995)). Courts balance this belief in a fresh start with the principle that "perpetrators of fraud are not allowed to hide behind the skirts of the Bankruptcy Code." *In re Biondo*, 180 F.3d at 130 (citing *Cohen v. de la Cruz*, 523 U.S. 213, 217 (1998)).

---

[40] Richardson and other Beach Commercial employees compiled the summary of damages. Tr. 59.

*McCoy v. McCoy* (*In re McCoy*), Adv. No. 15-07042-SCS, 2016 WL 4268702, at *8 (Bankr.

E.D. Va. Aug. 11, 2016) (quoting *Miller v. Liatos* (*In re Liatos*), Adv. No. 11-07052-SCS, 2012

WL 3260350, at *5 (Bankr. E.D. Va. Aug. 8, 2012)); *see also Dominion Va. Power v. Robinson*

(*In re Robinson*), 340 B.R. 316, 328-29 (Bankr. E.D. Va. 2006); *Elrod v. Bowden* (*In re*

*Bowden*), 326 B.R. 62, 81 (Bankr. E.D. Va. 2005). Section 523(a) requires the plaintiff to prove

the nondischargeability of a debt by a preponderance of the evidence. *Grogan v. Garner*, 498

U.S. 279, 291 (1991); *Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d 244, 249 (4th Cir. 1994);

*Combs v. Richardson*, 838 F.2d 112, 116 (4th Cir. 1988); *In re McCoy*, 2016 WL 4268702, at *8.

Therefore, Beach Commercial must prove by a preponderance of the evidence that the debt owed

to it by Matkins is nondischargeable under 11 U.S.C. §§ 523(a)(2)(A) and/or 523(a)(4).

A. Liability Under the Factoring Agreement

As a preliminary matter, the Court must address whether a contract was formed between

Bay Rivers and Beach Commercial pursuant to the Factoring Agreement. At trial, Richardson

stated that the Factoring Agreement was not a contract because it did not require Bay Rivers to

submit invoices for sale. Tr. 51. Nevertheless, the agreement listed rights and obligations that

would legally bind Bay Rivers if it offered invoices for sale that Beach Commercial then

purchased. *See generally* Pl.'s Ex. 2. Therefore, each time Beach Commercial purchased

invoices, a contract was formed between Bay Rivers and Beach Commercial, the terms of which

were governed by operation of the Factoring Agreement. *See id*. § 1.4. Further, it is undisputed

that Matkins personally guaranteed all debts to Beach Commercial that Bay Rivers incurred

under the Factoring Agreement; therefore, if Bay Rivers violated the Factoring Agreement,

Matkins is liable for any damages resulting therefrom. *See* Pl.'s Ex. 3, paras. 2, 7.

B. The Huntington Ingalls Invoices

1. Matkins's Liability for Representations on the June 27, 2017 ATS Agreement

The Court will first address whether Matkins can be held liable for representations made on the ATS Agreement submitted on June 27, 2017 (the "June 27, 2017 ATS Agreement") because he did not complete, review, or submit the form to Beach Commercial. *See* Answer, at paras. 18-19; Tr. 116, 138-40, 145. The Court has found that bookkeeper Shelley Arthur completed most of the ATS Agreements, answered each question thereon, and used Matkins's signature stamp on each form, including the one submitted on June 27, 2017. Tr. 87-89, 94, 145. The Court must determine at the outset if Matkins is liable under the Factoring Agreement and Guaranty despite the fact that Arthur answered the questions as they relate to the representations on the June 27, 2017 ATS Agreement.

Matkins's liability is confirmed by basic application of principal-agency theory. "Under traditional agency law, an agency relationship exists when a principal 'manifests assent' to an agent 'that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.'" *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 659-60 (4th Cir. 2019) (quoting Restatement (Third) of Agency § 1.01 (Am. Law Inst. 2006)). "'The doctrine of principal and agent—whether disclosed or undisclosed—recognizes that privity of contract exists. The act of the agent is the act of the principal.'" *Mayo v. Wells Fargo Bank, N.A.*, 30 F. Supp. 3d 485, 493 (E.D. Va. 2014) (quoting *Harris v. McKay*, 138 Va. 448 (1924)). In such instances, a principal is bound to the actions of an agent when the agent possesses actual or apparent authority to undertake such actions. *Rahbar v Law Office of Arquilla & Poe, PLC*, Case No. 1:18-cv-1475, 2019 WL 1575191, at *10 (E.D. Va. Apr. 11, 2019). Actual authority is conferred when the principal gives explicit permission to the agent to

act on the principal's behalf. *World Field Servs. Trading, DMCC v. M/V Hebei Shijiazhuang*, 12 F. Supp. 3d 792, 802 (E.D. Va. 2014) (citing *Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading, Inc.*, 697 F.3d 59, 71 (2d Cir. 2012)). "Actual authority exists 'when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act.'" *Ashland Facility Operations, LLC v. Nat'l Labor Relations Bd.*, 701 F.3d 983, 990 (4th Cir. 2012) (quoting Restatement (Third) of Agency § 2.01 (Am. Law Inst. 2006)). In contrast, apparent authority is "'created by operation of law and established by a principal's actions that would reasonably lead a third person to conclude that an agency exists,' regardless of whether the principal and agent intended to establish an agency relationship." *Wynn's Extended Care, Inc. v. Bradley*, 619 F. App'x 216, 218 (4th Cir. 2015) (quoting *Sanchez v. Medicorp Health Sys.*, 270 Va. 299, 304 (2005)). Under Virginia law, an employment relationship can establish *prima facie* evidence of an agency relationship, in which instance the agent's own representations become admissible, and the principal bears the burden of proving that the agent acted outside the scope of his authority. *MBA, Inc. v. VNU Amvest, Inc. (In re MBA, Inc.)*, 51 B.R. 966, 973 (Bankr. E.D. Va. 1985) (citing *Turner v. Burford Buick Corp.*, 201 Va. 693, 697-98 (1960)).

In the instant case, as a Bay Rivers employee who worked under Matkins and at his direction, a *prima facie* case of agency is established that Arthur was Matkins's agent. By her testimony, Arthur made the same representations on each ATS Agreement using the first ATS Agreement completed by Matkins as her guide. Tr. 89. Once supplied with a list of invoices to sell to Beach Commercial, Arthur completed the ATS Agreement, signed it using Matkins's signature stamp, and submitted it to Beach Commercial. *Id.* at 87-89, 94, 138, 145. Matkins does

not rebut the presumption that Arthur acted as his agent; indeed, he only gives credence to the conclusion that Arthur had actual authority to act on his behalf. Matkins testified that he gave Arthur permission to sign ATS Agreements using the signature stamp and submit them to Beach Commercial. *Id*. at 135-36, 145. The evidence shows that Matkins relied on Arthur to fill out the June 27, 2017 ATS Agreement, as he admitted that he only completed the first one submitted to Beach Commercial and stated that the agreement sent to Beach Commercial on June 27, 2017, "would have come from her." *Id*. at 147; *see also id.* at 138. The Court concludes that Arthur's actions were committed within the scope of her employment duties as expressly assigned to her by Matkins, that Arthur her asset to so act, and thus was acting as his agent.

The Court therefore finds that Matkins is liable for the representations made on the June 27, 2017 ATS Agreement. Further, under the Guaranty, Matkins personally guaranteed all liability and obligations that Bay Rivers incurred under the Factoring Agreement. Matkins's liability pursuant to the Factoring Agreement and the Guaranty accordingly extends to the representations made on the June 27, 2017 ATS Agreement. *See* Pl.'s Ex. 3, paras. 2, 7.

2. 11 U.S.C. § 523(a)(2)(A): False Pretenses, False Representations, or Actual Fraud

Having established that Matkins's liability under the Factoring Agreement extends to the June 27, 2017 ATS Agreement, the Court must now consider whether Beach Commercial has satisfied its burden regarding the requirements of 11 U.S.C. § 523(a)(2)(A) to sustain the conclusion that all or a portion of the debt here resulted from either false pretenses, false representations, or actual fraud and should be declared nondischargeable.[41] As this Court and

---

[41] The Supreme Court held in *Husky International Electronics, Inc.v. Ritz* that the term "actual fraud" under Section 523(a)(2)(A) encompasses forms of fraud such as fraudulent conveyances that do not require a false representation. *Husky Int'l Elecs., Inc.v. Ritz*, 136 S. Ct. 1581, 1586 (2016). Because Beach Commercial's claim is based on an alleged misrepresentation regarding

others have previously held, for a debt to be determined nondischargeable under § 523(a)(2)(A),

the plaintiff must prove five elements by a preponderance of the evidence:

> (1) That the debtor made a representation;

> (2) That at the time the representation was made, the debtor knew the representation was false;

> (3) That the debtor made the false representation with the intention of deceiving the creditor;

> (4) That the creditor relied on such a representation; and

> (5) That the creditor sustained the alleged loss and damage as the proximate result of the false representation.

*McCoy v. McCoy* (*In re McCoy*), Adv. No. 15-07042-SCS, 2016 WL 4268702, at *9 (Bankr.

E.D. Va. Aug. 11, 2016) (quoting *Miller v. Liatos* (*In re Liatos*), Adv. No. 11-07052-SCS, 2012

WL 3260350, at *6 (Bankr. E.D. Va. Aug. 8, 2012)); *see also OSB Mfg., Inc. v. Hathaway* (*In re

Hathaway*), 364 B.R. 220, 232 (Bankr. E.D. Va. 2007) (quoting *Fowler v. Garey* (*In re Garey*),

258 B.R. 356, 360-61 (Bankr. E.D. Va. 2000)); *Parker v. Grant* (*In re Grant*), 237 B.R. 97, 112

(Bankr. E.D. Va. 1999); *Spinoso v. Heilman* (*In re Heilman*), 241 B.R. 137, 149 (Bankr. D. Md.

1999); *Mills v. Hyman* (*In re Hyman*), 219 B.R. 699, 701 (Bankr. D.S.C. 1998).

### a. Did Bay Rivers, Through Matkins, Make a Misrepresentation?

The alleged misrepresentation was made on the June 27, 2017 ATS Agreement, which

represented that Bay Rivers' customer, Huntington Ingalls, had already received the items listed

on the invoices offered for sale with the agreement and was satisfied with the quantity and

quality of the items. Complaint, at paras. 19-20, 34. Representations are either express or

implied. *In re McCoy*, 2016 WL 4268702, at *9. It is undisputed that a representation was made

---

the Huntington Ingalls Invoices, the Court need not determine whether a fraudulent conveyance occurred in accordance with the Supreme Court's analysis in *Husky*.

here, and the analysis accordingly turns to whether that representation constitutes a misrepresentation. Misrepresentations consist of any words or conduct producing "a false or misleading impression of fact in the mind of another" and are likewise characterized as express or implied. *Kendrick v. Pleasants* (*In re Pleasants*), 231 B.R. 893, 897 (Bankr. E.D. Va. 1999) (citing *Longo v. McLaren* (*In re McLaren*), 3 F.3d 958, 961 (6th Cir. 1993)). A false representation is an express misrepresentation, while a false pretense refers to an implied misrepresentation or 'conduct intended to create and foster a false impression.'" *In re Hathaway*, 364 B.R. at 232 (citing *Nat'l Bank of N. Am. Newmark* (*In re Newmark*), 20 B.R. 842, 854 (Bankr. E.D.N.Y. 1982)). A breach of contract does not itself constitute a misrepresentation under § 523(a)(2)(A). *In re Grant*, 237 B.R. at 112 (citing *Rezin v. Barr* (*In re Barr*), 194 B.R. 1009, 1017 (Bankr. N.D. Ill. 1996)). If a debtor has no intent to fulfill the contractual terms when the contract is formed and the debtor later defaults, the breached contract may provide the prerequisite for a nondischargeability claim based on fraud. *Webb v. Isaacson* (*In re Isaacson*), 478 B.R. 763, 775 (Bankr. E.D. Va. 2012); *see also Assoc. Receivables Funding v. O'Donnell* (*In re O'Donnell*), 523 B.R. 308, 321 (Bankr. D. Mass. 2014) (finding that the statement by the seller of invoices to the buyer that the seller had shipped product to a customer, thereby inducing the buyer to purchase the seller's invoices, was a misrepresentation).

On June 27, 2017, Bay Rivers submitted an ATS Agreement along with copies of the Huntington Ingalls Invoices as its offer to sell those invoices to Beach Commercial. Tr. 25-26, 122-23; Pl.'s Ex. 9; Pl.'s Ex. 18, at 10. The June 27, 2017 ATS Agreement contained the representation that Huntington Ingalls had already received the goods listed on the invoices and was satisfied with their quality and quantity. Pl.'s Ex. 9. This representation was made despite the items not having been shipped to Huntington Ingalls and was therefore untrue when it was

made on June 27, 2017. Tr. 27, 147-48, 158; *see also* Def.'s Ex. B. At trial, Matkins admitted

that the representation on the ATS Agreement was inaccurate. Tr. 147-48. Accordingly, the

Court finds that an express misrepresentation was made to Beach Commercial.

    b. Did Bay Rivers, by Matkins, Know the Representation was False When it was Made?

    For a debt to be nondischargeable under Section 523(a)(2)(A), the plaintiff must prove

that the debtor knew or should have known that the representation was false when it was made.

*OSB Mfg., Inc. v. Hathaway* (*In re Hathaway*), 364 B.R. 220, 234 (Bankr. E.D. Va. 2007);

*Dominion Va. Power v. Robinson* (*In re Robinson*), 340 B.R. 316, 347 (Bankr. E.D. Va. 2006)

(citing *Koma v. Brooks* (*In re Brooks*), 4 B.R. 237, 238 (Bankr. S.D. Fla. 1980)); *KMK*

*Factoring, L.L.C. v. McKnew* (*In re McKnew*), 270 B.R. 593, 619 (Bankr. E.D. Va. 2001);

*Parker v. Grant* (*In re Grant*), 237 B.R. 97, 115 (Bankr. E.D. Va. 1999). A review of the events

prior to June 27, 2017, provides insight into whether Bay Rivers, via Matkins, knew or should

have known that the representation that Huntington Ingalls had received the goods listed on the

invoices and was satisfied with their quality and quantity was false when it was made.

    In May 2017, Huntington Ingalls placed an order with Bay Rivers for 340 product items,

which is reflected in the Huntington Ingalls Invoices. Pl's. Ex. 8. Lacking the necessary

equipment to fulfill the order, Bay Rivers subcontracted production of the order to GeoQuip on

May 31, 2017, requesting delivery of the items by July 5, 2017. Tr. 118-19; Pl.'s Ex. 4; Pl.'s Ex.

5; Pl.'s Ex. 31, at 24-25; *see also* Tr. 69, 148-49. GeoQuip's general manager Todd Szydlik met

with Matkins in early June 2017 to discuss not only the difficulty of meeting the July 5, 2017

deadline because of the order's production and material requirements but also Bay Rivers'

outstanding debt to GeoQuip. *Compare* Pl.'s Ex. 31, at 16-18, 26-27, 31-32, *with* Tr. 119.

Szydlik testified that Matkins was aware of the production requirements of such a large order,

including the production timeframe. *See* Pl.'s Ex. 31, at 16-18, 26-27, 31-32. Szydlik further

testified that Bay Rivers never contacted GeoQuip to expedite the order, and at no point was a

June 27, 2017 delivery date discussed. *Id.* at 30, 33. Szydlik explained that producing the items

by such a date was "impossible physically."[42] *Id.* at 32.

At trial, Matkins did not recall Szydlik telling him that fulfilling the order by July 5,

2017, would be difficult but also did not deny that the conversation occurred. Tr. 154. Matkins

stated that he was aware that the Huntington Ingalls order was subcontracted to GeoQuip but

unaware of the order's progress. *Id.* at 119. According to Matkins, he contacted Szydlik to ensure

the order would be delivered because Matkins thought Bay Rivers was on a "credit hold" with

GeoQuip. *Id.* at 119, 152-53. Matkins testified that Szydlik told him the order would be shipped

approximately eight days earlier than the requested July 5, 2017 due date and assured Matkins

the order would ship "that week" even though Szydlik, according to Matkins, knew that Bay

Rivers could not pay for the order. *Id.* at 120, 122, 153, 155-56, 160. Matkins's statements

contradict Szydlik's testimony that GeoQuip had only produced about 20% of the order by early

July 2017. Pl.'s Ex. 31, at 38-39, 41. The logical conclusion follows that 20% of the order or less

would have been completed in June 2017, the period during which Matkins claims Szydlik

promised to ship the entire order. *See* Tr. 120, 122, 153, 155-56, 160. The Court finds Szydlik's

testimony of his communications with Matkins to be more credible and supports the conclusion

that Matkins (and thereby Bay Rivers) knew or should have known that GeoQuip would not ship

the items on the Huntington Ingalls Invoices by June 27, 2017.

---

[42] According to Szydlik, the June 27, 2017 date was impossible to satisfy because the aluminum needed to complete the order was not scheduled to arrive until June 20, 2017, and the parts could not be fabricated to conform with the order requirements within six days. Pl.'s Ex. 31, at 31-32.

Matkins's testimony that he did not become aware of the Huntington Ingalls order until after the order was subcontracted to GeoQuip also contradicts Amanda McClendon's testimony. McClendon, Bay Rivers' Production Controller, credibly testified that Matkins was aware of and involved with the order placed with GeoQuip to fulfill the Huntington Ingalls order. According to McClendon, Matkins's personal approval was required due to the order's dollar amount, which exceeded $158,000.00. *Compare* Tr. 70-71, *with id.* at 119. Next, the purchase order GeoQuip received from Bay Rivers shows a shipment date of July 5, 2017, and there is no further evidence indicating that the date was ever changed. Pl.'s Ex. 5; Pl.'s Ex. 31, at 30 (testimony by Szydlik that the purchase order was never amended). Last, in the July 6, 2017 email from Walt Harrell to Kristen Shafer, Harrell apologized that GeoQuip was late completing the order and explained that GeoQuip planned to send partial quantities of the items beginning July 10, 2017, and every 2 days thereafter. Def.'s Ex. B. The additional evidence presented supports Szydlik's account that GeoQuip had a difficult time meeting the requested July 5, 2017 deadline and thus could not have shipped the items by June 27, 2017. The Court must conclude that Szydlik's testimony is credible.

At trial, Matkins presented the July 6, 2017 email from Harrell to Shafer as proof that GeoQuip intended to complete and ship the order to enable Bay Rivers to fulfill Huntington Ingalls' order. Tr. 177-78. Such evidence is countered, again, by Szydlik's testimony that Bay Rivers needed to make a payment by early July 2017, which testimony Matkins confirms, for GeoQuip to fulfill the pending order. *Id.* at 156-57; Pl.'s Ex. 31, at 31*, 34, 36-37. The evidence is undisputed that Bay Rivers never made a payment to GeoQuip, either by July 1, 2017, or otherwise. Tr. 157-58; Pl.'s Ex. 31, at 48. Even setting this counterevidence aside, it is axiomatic that the July 6, 2017 email was sent *after* Bay Rivers sold the Huntington Ingalls Invoices to

Beach Commercial on June 27, 2017. *Compare* Pl.'s Ex. 9, *with* Def's. Ex. B. Matkins's belief that the items would eventually ship (Tr. 122-23) does not obviate the fact that, as of June 27, 2017, Matkins and Bay Rivers knew or should have known that the misrepresentation regarding the Huntington Ingalls Invoices was false.

The Court finds that GeoQuip was never asked to complete the order by a date other than July 5, 2017. The Court further finds that GeoQuip could not ship the items by June 27, 2017, due to material and production requirements. Because Szydlik told Matkins that it would be difficult to complete the order by the date of July 5, 2017, and still had not shipped the order by June 27, 2017, the Court can infer that Bay Rivers and Matkins were aware, or should have been aware, of GeoQuip's inability to complete the order by June 27, 2017. The July 6, 2017 email fails to rebut other, credible evidence that Matkins and Bay Rivers knew or should have known that the June 27, 2017 ATS Agreement contained a misrepresentation at the time it was made, which is the proper source of inquiry. Accordingly, the Court concludes that Matkins, and thus, Bay Rivers, knew or should have known that Huntington Ingalls had not received its order on or before June 27, 2017.

### c. Was the Misrepresentation Made with the Intent to Deceive?

To sustain its burden, Beach Commercial must additionally prove that the misrepresentation was made with the intent to deceive it. As direct evidence of intent to deceive often does not exist, a plaintiff may prove the debtor's state of mind using circumstantial evidence to enable the Court to infer intent. *McCoy v. McCoy* (*In re McCoy*), Adv. No. 15-07042-SCS, 2016 WL 4268702, at *13 (Bankr. E.D. Va. Aug. 11, 2016). "'[D]irect proof of intent (*i.e.,* the debtor's state of mind) is nearly impossible to obtain[.]'" *Universal Bank, N.A. v. Grause* (*In re Grause*), 245 B.R. 95, 99 (B.A.P. 8th Cir. 2000) (quoting *Caspers v. Van Horne*

(*In re Van Horne*), 823 F.2d 1285, 1287 (8th Cir. 1987)); *OSB Mfg., Inc. v. Hathaway* (*In re Hathaway*), 364 B.R. 220, 235 (Bankr. E.D. Va. 2007); *Marunaka Dainichi Co. v. Yamada* (*In re Yamada*), 197 B.R. 37, 40 (Bankr. E.D. Va. 1996); *W. Union Corp. v. Ketaner* (*In re Ketaner*), 154 B.R. 459, 465 (Bankr. E.D. Va. 1992). "'An intent to deceive may be inferred from a false representation which the debtor should have known would induce a creditor.'" *In re Hathaway*, 364 B.R. at 235 (quoting *Parker v. Grant* (*In re Grant*), 237 B.R. 97, 115 (Bankr. E.D. Va. 1999)); *see also Bebber v. J.M. Westall & Co.* (*In re Bebber*), 192 B.R. 120, 124 (M.D.N.C. 1995). If the debtor recklessly makes a false representation that he should know will induce the creditor's reliance, the debtor's intent to deceive may also be inferred for purposes of § 523(a)(2)(A). *In re Hathaway*, 364 B.R. at 235 (citing *In re Grant*, 237 B.R. at 115); *see also Household Fin. Corp. v. Kahler* (*In re Kahler*), 187 B.R. 508, 513 (Bankr. E.D. Va. 1995). "The recklessness 'must exceed negligence and rise to the level of reckless disregard for the truth.'" *In re Hathaway*, 364 B.R. at 235 (quoting *In re Grant*, 237 B.R. at 115).

The intent to defraud "'must exist at the time the debtor made the representations; any subsequent conduct that is contrary to the original representation does not necessarily indicate that the original representation was false.'" *Id.*; *see also In re McCoy*, 2016 WL 4268702, at *13. If a plaintiff adduces circumstantial evidence such that the Court can infer the debtor intended to deceive, unsupported assertions of honest intent from the debtor will be insufficient to overcome this inference. *In re McCoy*, 2016 WL 4268702, at *13 (citing *In re Yamada*, 197 B.R. at 40); *see also In re Ketaner*, 154 B.R. at 465. The Court must therefore review the facts and circumstances surrounding the misrepresentation on the June 27, 2017 ATS Agreement to determine if it was made with the requisite intent to deceive Beach Commercial and to induce it to purchase the Huntington Ingalls Invoices.

First, Bay Rivers, by Matkins as its principal, knew that only invoices for goods its customers had already received could be offered for sale to Beach Commercial. Pl. Ex. 2, §§ 1.4, 9.1. Bay Rivers also warranted that its disclosures on the ATS Agreements submitted to Beach Commercial were accurate. *See id.* at 11 (ATS Agreement). The misrepresentation on the June 27, 2017 ATS Agreement was made pursuant and subject to the terms of the Factoring Agreement, which Matkins, on Bay Rivers' behalf, reviewed, certified his understanding, and bound both himself and Bay Rivers. *See* Tr. 112-13. *See generally* Pl.'s Ex. 2; Pl.'s Ex. 3. Under the Factoring Agreement, Bay Rivers sold completed product invoices to Beach Commercial in exchange for funds. If Bay Rivers sold an invoice to Beach Commercial before the customer received the goods listed in the invoice, then Beach Commercial was entitled to full recourse against Bay Rivers. Pl.'s Ex. 2, § 5.2.i; *see also* Tr. 16-17. The ATS Agreement required Bay Rivers to confirm that the customer had already received the goods listed in the corresponding invoices for sale. Pl.'s Ex. 2, at 11. Bay Rivers was also obligated to acknowledge in each ATS Agreement that Beach Commercial was relying on Bay Rivers to make accurate representations regarding the status of the invoices offered for sale. Pl.'s Ex. 2, § 9.1; *see also id.* at 11. Accordingly, the Court finds that on June 27, 2017, both Bay Rivers and Matkins knew the importance of making accurate disclosures to Beach Commercial and its requirement to only sell invoices for goods that its customers had already received.

Second, Bay Rivers knew that a misrepresentation on the June 27, 2017 ATS Agreement that Huntington Ingalls received its items would elicit upfront payments if Beach Commercial decided to purchase the invoices. As previously explained, Bay Rivers knew that Huntington Ingalls had not received its products by June 27, 2017, and was aware of the criticality of both making accurate disclosures and selling only those invoices for goods its customers had already

received. In addition, it is undisputed that Bay Rivers and Beach Commercial factored several invoices prior to June 27, 2017. *See* Complaint, para. 12; Answer, at para. 12. Nevertheless, Bay Rivers submitted the June 27, 2017 ATS Agreement representing that Huntington Ingalls had received the items listed on the invoices being offered for sale. Pl's Ex. 9. Bay Rivers thus knew or should have known that representing to Beach Commercial that Huntington Ingalls had received the goods listed in the corresponding invoices would elicit upfront payments equal to 81% of the invoices' face value. *See* Pl.'s Ex. 2, § 2.2; Pl.'s Ex. 10.

Finally, Bay Rivers failed to correct or disclose the misrepresentation to Beach Commercial after it was made. Bay Rivers received an email from GeoQuip employee Walt Harrell on July 6, 2017, explaining that partial quantities of the items for the Huntington Ingalls order would begin shipping on July 10, 2017. Def.'s Ex. B. Bay Rivers did not inform Beach Commercial about the delayed delivery. Soon after the July 6, 2017 email, GeoQuip placed Bay Rivers on a credit hold, of which Matkins was informed no later than July 14, 2017. Pl.'s Ex. 31, at 37-40; *see also id.* at 41-43; Tr. 120. Still, no one at Bay Rivers communicated to Beach Commercial that GeoQuip would not deliver the order until the credit hold was lifted.

According to Bleicken, Bay Rivers was supposed to reverse an invoice sale if it later discovered that the products listed thereon were not received by the customer. Pl.'s Ex. 28, at 79-80; *see* Pl.'s Ex. 2, § 5.3 (providing for Bay Rivers to reimburse Beach Commercial if it breached the Factoring Agreement, such as by selling an invoice prior to delivery of the goods to its customer). Bay Rivers never initiated a reversal of the sale of the Huntington Ingalls Invoices. When Beach Commercial discovered that Huntington Ingalls had not received its order in mid-July 2017, Bay Rivers offered to allow Beach Commercial to retain 100% of the proceeds of other invoices Bay Rivers was selling to make Beach Commercial whole, but it made no direct

effort to comply with the Factoring Agreement, reverse the sale, and reimburse Beach Commercial. Tr. 34, 166. Instead, when Beach Commercial requested that Huntington Ingalls redirect payments on Bay Rivers' invoices to it, Bay Rivers apparently interfered in this process and directed Huntington Ingalls to make payments to Bay Rivers, contrary to Beach Commercial's earlier request. *Id*. at 41, 56-57; Pl.'s Ex. 20, at 1; *see* Pl.'s Ex. 13, at 1, 4.

The Court finds that Bay Rivers' failure to make accurate disclosures on the June 27, 2017 ATS Agreement was reckless. Bay Rivers was aware of the importance of accurate disclosure to Beach Commercial and the requirement to only sell invoices for goods that its customers had already received. Based on their previous invoice sales and the terms and representations outlined in the Factoring and ATS Agreements, Bay Rivers knew or should have known that its representation would induce Beach Commercial to make an upfront payment to Bay Rivers. Bay Rivers was also aware, or should have been aware, that as of June 27, 2017, Huntington Ingalls had not received the items it ordered. Despite this knowledge, Bay Rivers submitted an ATS Agreement on June 27, 2017, representing that Huntington Ingalls had already received the items, was satisfied with their quality and quantity (Pl.'s Ex. 9), and neither notified, corrected, nor reversed the misrepresentation after it was made.

The instant facts closely mirror those before the Court in *Associated Receivables Funding v. O'Donnell* (*In re O'Donnell*), 523 B.R. 308 (Bankr. D. Mass. 2014). In that case, Grove Electronics ("Grove"), a computer parts reseller owned by O'Donnell, the debtor, entered into a factoring agreement with Associated Receivables Funding ("ARF"). *In re O'Donnell*, 523 B.R. at 312. Under the factoring agreement, Grove agreed that by selling customer invoices, it was assigning its rights to payments thereon to ARF in exchange for ARF's immediate payment to Grove. *Id*. As in the instant case, the *O'Donnell* Court found that misrepresentations were made

to ARF that Grove had shipped items to its customers. *Id*. at 321. In examining Grove's dealings

with ARF, the Court found that on multiple occasions, Grove misrepresented to ARF that it had

shipped the goods referenced in the assigned invoices and made no attempt to correct the

misrepresentations even after Grove's customers notified it that they had not received the

invoiced goods. *Id*. at 321-22. Grove further made no attempt to inform ARF of the

misrepresentations after it received payment from ARF. *Id*. The Court inferred, based on the

circumstances and Grove's overall pattern of conduct before and after making the

misrepresentations, that Grove knew the items had not shipped and made the false

representations with the intent to deceive ARF. *Id*.

Here, Bay Rivers never informed Beach Commercial that Huntington Ingalls had not

received the items despite having such knowledge. Bay Rivers had several opportunities to notify

Beach Commercial about the misrepresentation on the June 27, 2017 ATS Agreement, as well as

about the credit hold GeoQuip placed on its order. Bay Rivers should have reimbursed Beach

Commercial for the Huntington Ingalls Invoices pursuant to the Factoring Agreement. Instead, as

the evidence shows, Bay Rivers did nothing to rectify its misrepresentation. Based upon the

evidence before the Court, the Court finds that Bay Rivers' failure to so act exceeds mere

negligence and rises to the level of a reckless disregard for the truth. Accordingly, the Court

finds that Bay Rivers made the misrepresentation with the intent to deceive Beach Commercial

into sending funds to it.

### d. Did Beach Commercial Justifiably Rely on the Misrepresentation?

A successful § 523(a)(2)(A) claim requires the plaintiff to be justified in relying on the

debtor's misrepresentation. *McCoy v. McCoy* (*In re McCoy*), Adv. No. 15-07042-SCS, 2016 WL

4268702, at *15 (Bankr. E.D. Va. Aug. 11, 2016) (citing *Hong v. Merzoug* (*In re Merzoug*), Adv.

No. 11-01228, 2012 WL 845528, at *3-4 (Bankr. E.D. Va. Mar. 12, 2012)). The "justifiable

reliance" standard is less demanding than "reasonable reliance." *Field v. Mans*, 516 U.S. 59, 73-

75, 77 (1995). The classic example pronounced by the Supreme Court illustrates the

requirement: "[A] buyer's reliance on [the seller's statement that the land is free of

encumbrances] is justifiable, even if he could have 'walked across the street to the office of the

register of deeds in the courthouse' and easily have learned of an unsatisfied mortgage." *Id*. at 70

(quoting Restatement (Second) of Torts § 540 cmt. b, illus. 1 (1976)). Although the plaintiff's

reliance must be justifiable, his conduct need not conform to the standard of a "reasonable man."

*In re McCoy*, 2016 WL 4268702, at *15. Rather, whether the plaintiff was justified in relying on

the representation "is a matter of the qualities and characteristics of the particular plaintiff, and

the circumstances of the particular case, rather than of the application of a community standard

of conduct to all cases." *Field*, 516 U.S. at 71.

Justifiable reliance does, however, have its limitations. A creditor cannot prove justifiable

reliance by a preponderance of the evidence if he has relied on obvious falsities. *Dominion Va.

Power v. Robinson* (*In re Robinson*), 340 B.R. 316, 348 (Bankr. E.D. Va. 2006). As the Supreme

Court has explained, a creditor "'cannot recover if he blindly relies upon a misrepresentation the

falsity of which would be patent to him if he had utilized his opportunity to make a cursory

examination or investigation . . . . [T]he rule . . . applies only when the recipient of the

misrepresentation is capable of appreciating its falsity at the time by the use of his senses.'"

*Field*, 516 U.S. at 71 (quoting Restatement (Second) of Torts § 541 cmt. a (Am. Law Inst.

1976)); *see also Guar. Residential Lending, Inc. v. Koep* (*In re Koep*), 334 B.R. 334 B.R. 364,

372 (Bankr. D. Md. 2005) ("[T]he plaintiff is required to exercise some judgment[.]"); *Boyd v.*

*Loignon* (*In re Loignon*), 308 B.R. 243, 249 (Bankr. M.D.N.C. 2004) ("A creditor must show some degree of diligence . . . .").

This Court has held that the justifiable reliance standard "impos[es] no duty to investigate, absent of factors arousing suspicion." *OSB Mfg., Inc. v. Hathaway* (*In re Hathaway*), 364 B.R. 220, 236 (Bankr. E.D. Va. 2007) (citing *Parker v. Grant* (*In re Grant*), 237 B.R. 97, 116 (Bankr. E.D. Va. 1999)); *see also Field*, 516 U.S. at 73 n.12. A plaintiff who disregards warning signs or "red flags" cannot satisfy the justifiable reliance standard. *Giovanni v. Grayson, Kubli & Hoffman* (*In re Giovanni*), 324 B.R. 586, 594 (E.D. Va. 2005). Thus, a plaintiff must investigate when he is warned or suspicious of a deception. *See id*. If the investigation leads the plaintiff to conclude that the debtor's representations are credible, the plaintiff can satisfy the justifiable reliance standard. *Id.* (concluding attorney justifiably relied on debtor's representation that her claim had merit because he properly investigated a potential "red flag" that called the veracity of her claim into question); *see also Copper v. Lemke* (*In re Lemke*), 423 B.R. 917, 924 (B.A.P. 10th Cir. 2010) (holding that reliance was not justifiable because plaintiff continued to lend money to the debtor after various "red flags" arose, such as the debtor requesting funds for purposes clearly unrelated to the loan's intended project and that exceeded the amount of his original estimate); *In re Robinson*, 340 B.R. at 349-50 (holding that plaintiff did not justifiably rely on debtor's false representations because it continuously ignored "red flags" that were available to and accessible by the plaintiff for over two years). Thus, the Court necessarily begins its analysis with whether any "warning signs" or "red flags" existed that should have alerted Beach Commercial to the misrepresentation that the items listed on the Huntington Ingalls Invoices had been delivered. An analysis of the additional documents submitted with the June 27, 2017 ATS Agreement; Bay Rivers' prior interactions with Beach Commercial; and

Beach Commercial's knowledge of Bay Rivers' financial health reveals no "red flags" that would have given rise to any suspicion prior to the misrepresentation on June 27, 2017. Further, once Beach Commercial discovered the misrepresentation, it diligently investigated the issue.

First, the documents accompanying the June 27, 2017 ATS Agreement reveal no red flags warranting an investigation of the representations in the agreement. As previously explained, the June 27, 2017 misrepresentation was made within the context of a Factoring Agreement previously entered into between Bay Rivers and Beach Commercial. *See generally* Pl.'s Ex. 2. As required by the Factoring Agreement, when Bay Rivers submitted the June 27, 2017 ATS Agreement, it also submitted signed copies of its customer's contract or purchase order,[43] along with copies of the corresponding invoices to allow Beach Commercial to verify the invoices' existence. Pl.'s Ex. 2, §§ 1.4, 6.1. BB&T supplied the necessary subordination agreement to enable Beach Commercial to purchase the invoices and obtain a first priority lien on them. Tr. 63; *see also* Pl.'s Ex. 2, § 6.1; Pl.'s Ex. 18. The additional documents accompanying the June 27, 2017 ATS Agreement revealed no warning signs of fraud or misconduct, as they appeared to be legitimately fulfilled invoices for which Bay Rivers was awaiting customer payment. *See* Tr. 25-28; Pl.'s Ex. 8; Pl.'s Ex. 9.

Second, Beach Commercial's interactions with Bay Rivers prior to June 27, 2017, revealed no cautionary signals alerting Beach Commercial to the potential for a misrepresentation or need for further inquiry into the veracity of the documentation. A BB&T officer recommended Bay Rivers as a customer to Beach Commercial in February 2017 and gave Bay Rivers a "glowing reference." Tr. 12; *see* Pl.'s Ex. 16, at 5; *see also* Tr. 55, 109. Before

---

[43] While the purchase order from Huntington Ingalls was not tendered among Beach Commercial's exhibits, at no point did Beach Commercial provide evidence that such document was not included among the attachments to the June 27, 2017 ATS Agreement.

entering into the Factoring Agreement, Bay Rivers completed an application showing its profits, losses, accounts receivable, and accounts payable and also provided a balance sheet. Tr. 19; Pl's. Ex. 1. Beach Commercial was satisfied with the representations made on Bay Rivers' application and approved it as a customer the day after receiving its application. Pl.'s Ex. 16, at 2. Additionally, the Complaint alleges that between February 7, 2017, and August 31, 2017, many successful transactions occurred between the parties, with Beach Commercial purchasing from Bay Rivers invoices with an aggregate face value of $1,872,616.84, with collections totaling $1,606,709.05. Complaint, paras. 12-13. Thus, it appears that Bay Rivers and Beach Commercial had a mutually beneficial factoring relationship during that time period. The Court finds that Beach Commercial's relationship with Bay Rivers prior to June 27, 2017, exhibited no warning signs to alert Beach Commercial of potential future misrepresentations.

To be sure, Beach Commercial alleges in its Complaint that the June 27, 2017 misrepresentation regarding the delivery of the products listed on the Huntington Ingalls Invoices was one of several improper actions committed by Bay Rivers under the Factoring Agreement. Complaint, paras. 15-16. Richardson testified that one of the two focuses of the Complaint was such misrepresentation because it was one of the most obvious cases of fraud under Section 523. Tr. 42. It is unclear, however, whether the alleged, additional improper actions were committed before the June 27, 2017 misrepresentation, and if they were, whether Beach Commercial was aware of them before that date so as to warrant investigation into the veracity of the representation on the June 27, 2017 ATS Agreement. Therefore, the Court cannot conclude these other alleged improper actions were "red flags" that warranted investigation.

Finally, Beach Commercial's knowledge of Bay Rivers' financial condition did not reveal any red flags prior to the June 27, 2017 misrepresentation. Matkins, by counsel, argues

that Beach Commercial was aware of Bay Rivers' financial health and therefore was not justified in relying on Bay Rivers' misrepresentation in the June 27, 2017 ATS Agreement. *Id*. at 206-07; Answer, at para. 20. According to the evidence, however, the only financial issue Beach Commercial was aware of was Bay Rivers' overdrafts of its BB&T bank account. Tr. 21, 22-23; *see also* Pl.'s Ex. 11, at 9-11. Richardson was aware of Bay Rivers' overdraft problems because its employees would contact Beach Commercial to advise that the BB&T account was overdrawn and that BB&T would return its checks if it did not receive money by a certain time. Tr. 21, 52. Bay Rivers' frequent overdrafts lead Beach Commercial to maintain active communication with BB&T. *Id*. at 46-47.

While it is unknown when Beach Commercial became aware of Bay Rivers' overdraft issues, its potential awareness before June 27, 2017, raises the question of whether such knowledge could be considered a warning sign regarding the misrepresentation on the Huntington Ingalls Invoices. Based on the qualities and characteristics of Beach Commercial and the circumstances of this case, the Court finds that these overdraft issues could not be considered as such. Beach Commercial is a factoring company, with an established business model of purchasing invoices in exchange for upfront payments to companies with cash flow issues.[44] *Id*. at 45-46, 48; Stipulation, at paras. 2-3. While Richardson testified that he was aware of Bay Rivers' overdraft issues, characterizing such issues generally as "unusual" and asserting "a well-run company doesn't have overdrafts," he elaborated that overdrafts were often a sign of cash flow issues, which the factoring relationship was designed to remedy. Tr. 53; *see also id*. at 47. He explained that Bay Rivers could cure its overdraft issues by selling invoices to Beach

---

[44] Many of Beach Commercial's customers are obtained though referrals from banks whose clients have exhausted financing options, have cash flow problems, and are seeking additional sources of funding. Tr. 11-12, 14, 45.

Commercial and that such issues did not affect the creditworthiness of the invoices Beach Commercial purchased. *Id.* at 23, 53. Thus, Richardson's testimony confirms that, as a factoring company, Beach Commercial does not lend based upon the credit worthiness of the entity seeking to factor the invoices, but rather, relies solely upon the credit quality of a particular invoice for delivered goods. Accordingly, based on the unique qualities and characteristics of Beach Commercial and its stated business model, its possible knowledge of Bay Rivers' overdraft issues before June 27, 2017, could not be considered a warning sign or red flag with regard to the misrepresentations on the June 27, 2017 ATS Agreement.

Admittedly, Beach Commercial knew by virtue of the application, the balance sheet, and BB&T's recommendation that Bay Rivers owed $1.2 million to BB&T as of February 2017. *Id.* at 19, 110; *see* Pl.'s Ex. 1. Beach Commercial certainly could have asked for additional financial statements during their factoring relationship to confirm Bay Rivers' financial status; under the Factoring Agreement, Beach Commercial was entitled to require Bay Rivers to submit monthly or quarterly financial statements at any time. Pl.'s Ex. 2, § 8.4. However, Beach Commercial was under no obligation to invoke this privilege. As a sophisticated business entity, Beach Commercial was not required to continually examine Bay Rivers' financial statements but could justifiably rely on the representations made at the inception of their business relationship. *Foley & Lardner v. Biondo* (*In re Biondo*), 180 F.3d 126, 135 (4th Cir. 1999) (citing *Field*, 516 U.S. at 70) (holding that a sophisticated entity is not required to examine a debtor's financial statements, but can justifiably rely on the debtor's representation when the agreement was made). In other words, while Beach Commercial could not act with complete blind faith in Bay Rivers, it did not have to constantly supervise and review Bay Rivers' financial workings. *See In re Hathaway*, 364 B.R. at 236 ("Plaintiffs are not required to continually look over an entity's shoulder.").

The instant case can be distinguished from *In re McCoy*, where this Court found that the plaintiff was not justified in relying on the debtor's misrepresentation when she signed a promissory note with no intention of repayment. *In re McCoy*, 2016 WL 4268702, at *16. The plaintiff in *McCoy* failed to investigate the debtor's financial history, which included evidence of fiscal unreliability and a documented history of defaulting on debts. *Id.* In the instant case, there was no evidence of prior misconduct giving rise to any red flags that would have alerted Beach Commercial to Bay Rivers' misrepresentation. Beach Commercial was obligated to investigate further only upon suspicion of possible deception. *In re Giovanni*, 324 B.R. at 594; *In re Hathaway*, 364 B.R. at 237.

Once Beach Commercial learned of the misrepresentation, however, the evidence shows it took swift, diligent action to investigate and resolve the issue. In mid-July 2017, when Beach Commercial discovered that Huntington Ingalls never received its ordered items, contrary to the representation on the June 27, 2017 ATS Agreement, Richardson, on behalf of Beach Commercial, told Bay Rivers to "solve the problem," pay GeoQuip, and have the products delivered to Huntington Ingalls. Tr. 34, 166. In the meantime, Beach Commercial requested that Huntington Ingalls redirect all payments being made to Bay Rivers to Beach Commercial. *Id.* at 56-57; *see also* Pl.'s Ex. 20, at 1. Richardson also requested that Bay Rivers hold incoming invoice payments from Huntington Ingalls in escrow while the latter completed rerouting its payments. Pl.'s Ex. 20, at 2. Beach Commercial maintained its persistence in August 2017 by repeatedly seeking updates from Bay Rivers on the status of payments on the Huntington Ingalls Invoices. *See id.* at 9-14. Bleicken recounted that Richardson was "quite intense with his collection efforts" during this time. Pl.'s Ex. 28, at 74. Those efforts included frequent emails and calls to Matkins and visits to both Bay Rivers' facility and Matkins's home during business

hours. Tr. 60-61; Pl.'s Ex. 28, at 74. On September 1, 2017, Bleicken notified Beach Commercial in writing that GeoQuip never delivered the items and that Bay Rivers had not fulfilled the Huntington Ingalls contract. Tr. 35; Pl.'s Ex. 23, at 1. Richardson continued to reach out to Matkins to confirm the status of the Huntington Ingalls order. Pl.'s Ex. 23, at 4. It is undisputed that, despite its efforts, Beach Commercial never received payment on the Huntington Ingalls Invoices. *See* Tr. 42.

In sum, the testimony and evidence reveal a diligent and earnest effort to investigate the misrepresentation once Beach Commercial learned that Huntington Ingalls did not receive the items listed on the invoices corresponding with the June 27, 2017 ATS Agreement. This is unlike the case of *In re Robinson*, where plaintiff Dominion Power failed to investigate a tampered gas meter for two and one-half years, which led this Court to conclude that it did not satisfy the justifiable reliance element. *Dominion Va. Power v. Robinson* (*In re Robinson*), 340 B.R. 316, 349-50 (Bankr. E.D. Va. 2006). Here, Beach Commercial's response to the situation mirrors the plaintiff's rapid response in *In re Hathaway*. Once the plaintiff in *Hathaway* discovered that the defendant was misusing the company's credit card, the plaintiff promptly took steps to resolve the issue, including making the defendant pledge to repay the funds spent. *OSB Mfg., Inc. v. Hathaway* (*In re Hathaway*), 364 B.R. 220, 237 (Bankr. E.D. Va. 2007). Such actions contributed to the Court's conclusion that the plaintiff justifiably relied on the defendant's misrepresentations. *Id*. Likewise in the instant case, once it discovered the misrepresentation, Beach Commercial diligently investigated whether Huntington Ingalls received its order and pressured Bay Rivers to take the necessary steps to fulfill Huntington Ingalls' order.

Accordingly, a review of the additional documents submitted with the June 27, 2017 ATS Agreement, Bay Rivers' prior conduct, and Beach Commercial's knowledge of Bay Rivers'

financial health reveal no potential "red flags" that Beach Commercial should have been aware of prior to the June 27, 2017 misrepresentation. Once it discovered the misrepresentation in mid-July 2017, Beach Commercial undertook an earnest effort to investigate the issue. Therefore, the Court concludes that Beach Commercial was justified in relying on the misrepresentation on the June 27, 2017 ATS Agreement.

e. Did Beach Commercial's Damages Proximately Result From the Misrepresentation?

To recover on its § 523(a)(2)(A) claim, Beach Commercial must prove by a preponderance of the evidence that its damages were a proximate result of the misrepresentation. "Proximate cause is both (1) causation in fact, 'loss suffered by one who justifiably relies upon the truth of the matter misrepresented, if his reliance is a substantial factor in determining the course of conduct that results in his loss;' and (2) legal causation, 'if the loss might reasonably be expected to occur from the reliance.'" *Id.* (quoting *KMK Factoring, L.L.C. v. McKnew* (*In re McKnew*), 270 B.R. 593, 622 (Bankr. E.D. Va. 2001)); *see also Britton v. Price* (*In re Britton*), 950 F.2d 602, 604 (9th Cir. 1991); *Parker v. Grant* (*In re Grant*), 237 B.R. 97, 117 (Bankr. E.D. Va. 1999); *Shannon v. Russell* (*In re Russell*), 203 B.R. 303, 313 (Bankr. S.D. Cal. 1996). The evidence is incontrovertible that Beach Commercial suffered harm in this case. Matkins admits that he owes money to Beach Commercial for debt incurred by Bay Rivers, although he disputes the amount that was due and that the debt is nondischargeable. Answer, para. 22; Stipulation, para. 7. Beach Commercial justifiably relied on Bay Rivers' misrepresentation in the June 27, 2017 ATS Agreement, and by misrepresenting that Huntington Ingalls had already received the items listed on the invoices, Bay Rivers received money to which it otherwise would not have been entitled. As Richardson testified, Beach Commercial would not have purchased the invoices from Bay Rivers without the misrepresentation that Huntington Ingalls had already received the

goods. Tr. 30. Without this misrepresentation, Beach Commercial would not have suffered a loss. The misrepresentation was therefore a pivotal factor in Beach Commercial's decision to purchase the invoices. The Court thus finds that the first element of proximate cause, that of causation in fact, is satisfied.

The Court must also resolve whether Beach Commercial suffered damages that were legally caused by its reliance on the misrepresentation. The Huntington Ingalls Invoices submitted with the June 27, 2017 ATS Agreement appeared to be legitimately fulfilled and for which Bay Rivers was awaiting customer payment. *See* Pl.'s Ex. 8; Pl.'s Ex. 9. There were no signs that the invoices were fraudulent, and Matkins represented on the June 27, 2017 ATS Agreement that he understood that Beach Commercial was directly relying on Bay Rivers' representations that, *inter alia*, Huntington Ingalls had received the ordered items and was satisfied with their quantity and quality. Pl.'s Ex. 9. Thus, Beach Commercial's harm from relying on Bay Rivers' misrepresentation could be reasonably expected to occur.

The facts here are in stark contrast to those present in *In re Grant*. In that case, this Court found that while the plaintiffs suffered harm, there was no causal connection between the debtor's misrepresentation of his marital status at the time he leased a condominium and the physical damage later done to the property. *In re Grant*, 237 B.R. at 118. Similarly, in *Kaufman v. Vamvakaris*, the plaintiff failed to show a connection between the debtor-jeweler's misrepresentation that he had theft insurance and the later theft of the plaintiff's jewelry. *Kaufman v. Vamvakaris* (*In re Vamvakari*s), 197 B.R. 228, 230-31 (Bankr. E.D. Va. 1996). Instead, the facts of the present case demonstrate a clear causal connection between the misrepresentation and Beach Commercial's harm. Furthermore, Beach Commercial's harm would be reasonably expected to occur from the misrepresentation.

Having satisfied each of the required elements under 11 U.S.C. § 523(a)(2)(A), the Court concludes that the debt related to the Huntington Ingalls Invoices should be declared nondischargeable. The amount of the nondischargeable debt will be discussed in Section E., below.

### C. The Glotech Check

#### 1. § 523(a)(4): Fraud or Defalcation While Acting in a Fiduciary Capacity

Beach Commercial also seeks a determination of the dischargeability of debt related to invoice payments corresponding with the Glotech Check under Section 523(a)(4). Section 523(a)(4) excepts from discharge debts that arise from fraud or defalcation while a debtor was acting in a fiduciary capacity, embezzlement, or larceny. 11 U.S.C. § 523(a)(4). To prevail on a claim under § 523(a)(4), a creditor must prove both elements of the statute: that "the debt arose while the debtor was acting in a fiduciary capacity[,] and . . . that the debt arose from the debtor's fraud or defalcation." *Kubota Tractor Corp. v. Strack* (*In re Strack*), 524 F.3d 493, 497 (4th Cir. 2008) (citing *Pahlavi v. Ansari* (*In re Ansari*), 113 F.3d 17, 20 (4th Cir. 1997)); *see also Larsen v. Larsen* (*In re Larsen*), Adv. No. 1-16-01116-NHL, 2018 WL 4006935, at *6 (Bankr. E.D.N.Y. Aug. 17, 2018) ("[Section] 523(a)(4) requires that the debt be 'for,' or arise out of, defalcation such that there is a causal relationship between the act constituting defalcation and the debt in question."). Like Section 523(a)(2)(A), a successful § 523(a)(4) claim requires the plaintiff to prove each element by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

#### a. Did Bay Rivers Owe a Fiduciary Duty to Beach Commercial?

The Court must initially determine if the first requirement contemplated by the Fourth Circuit Court of Appeals under the *Strack* decision is met here: that the debt arose while the

debtor was acting in a fiduciary capacity. *In re Strack*, 524 F.3d at 497. "The fiduciaries contemplated under 11 U.S.C. § 523(a)(4) are 'persons in positions of ultimate trust,' including 'public officers, executors, administrators, guardians, trustees of express trusts, attorneys, and corporate directors.'" *Webb v. Isaacson* (*In re Isaacson*), 478 B.R. 763, 779 (Bankr. E.D. Va. 2012) (citing *Spinoso v. Heilman* (*In re Heilman*), 241 B.R. 137, 169-70 (Bankr. D. Md. 1999)). A contractual relationship alone is insufficient to establish a fiduciary relationship. *Id*. at 780. A contract that creates an express or technical trust may, however, create the requisite fiduciary relationship. *In re Strack*, 524 F.3d at 498 (citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 334 (1934)) ("[T]he creation of an express trust can give rise to the requisite fiduciary duty under Section 523(a)(4)."). The Court must look to the law of the state where the trust was allegedly created to determine whether such a trust was established. *Am. Bankers Ins. Co. of Florida v. Maness*, 101 F.3d 358, 363 (4th Cir. 1996) ("'[W]hile federal law creates the bankruptcy estate, . . . state law, absent a countervailing federal interest, determines whether a given property falls within this federal framework.'"). Therefore, the Court must look to the law of the Commonwealth of Virginia, where the trust was allegedly created between Bay Rivers and Beach Commercial, to determine if a trust indeed existed.

Under Virginia law, while use of the word "trust" is afforded great weight when considering whether an express trust is created, it is not determinative. *In re Strack*, 524 F.3d at 498 (citing *Broaddus v. Gresham*, 181 Va. 725, 732 (1943); *Exec. Comm. v. Shaver*, 146 Va. 73, 79 (1926)). In the instant case, the parties agreed as part of the Factoring Agreement that if Bay Rivers received customer payments for invoices previously sold to Beach Commercial, Bay Rivers was required to hold such proceeds as "trustee of an EXPRESS TRUST" for Beach Commercial's benefit. Pl.'s Ex. 2, §§ 3.6, 3.7. While such language weighs in favor of a

determination that the parties intended to form an express trust, the Court must also examine whether the parties intended the proceeds of the sold invoices, for which legal title was held by Beach Commercial, to be held in trust by Bay Rivers until the funds were transmitted to Beach Commercial. *Old Republic Nat'l Title Ins. Co. v. Tyler* (*In re Dameron*), 155 F.3d 718, 722 (4th Cir. 1998) (internal citations omitted) (quoting *Broaddus*, 181 Va. at 730) ("All that is necessary are words . . . 'which unequivocally show an intention that the legal estate was vested in one person, to be held in some manner or for some purpose on behalf of another[.]'"); *see also In re Strack*, 524 F.3d. at 499; *Leonard v. Counts*, 221 Va. 582, 588 (1980) ("An express trust is based on the declared intention of the trustor.").

In *Racetrac Petroleum, Inc. v. Kahn*, Judge Ellis discussed the Fourth Circuit's application of Virginia law in *Strack* to determine whether an express trust was created:

> [T]he *Strack* opinion identifies three primary indicia of an intent to create an express trust rather than a mere debt. They are: (i) the designated trustee lacks legal title to the property at issue; (ii) the trustee is restricted in his use of the property; and (iii) the property remains separate from the trustee's own property.

*Racetrac Petroleum, Inc. v. Kahn* (*In re Kahn*), 461 B.R. 343, 348 (E.D. Va. 2011) (hereinafter, "*Racetrac Petroleum*") (citing *In re Strack*, 524 F.3d at 499); *see also Broaddus*, 181 Va. at 732. Thus, under the guidance in *Strack* and as discussed in *Racetrac Petroleum*, the key questions under Virginia law are whether: (1) Beach Commercial, and not Bay Rivers, held legal title to the invoice proceeds; (2) Bay Rivers was restricted in its use of the invoice proceeds; and (3) the invoice proceeds were to be maintained separately from Bay Rivers' other funds. Like the express trust found in *Racetrac Petroleum*, the facts here plainly establish that all three indicia are met.

First, the parties agreed that, once Beach Commercial made its first payment (known as the down payment) to Bay Rivers for a sold invoice, the invoice's proceeds belonged to Beach Commercial. The Factoring Agreement states:

> The sale of an Invoice to Beach Commercial shall be complete and the ownership of and title to each Sold Invoice shall pass to Beach Commercial upon the date that (1) Beach Commercial deposits the Downpayment proceeds and/or (2) Beach Commercial applies any or all of the Downpayment proceeds to an Obligation of [Bay Rivers]. After that date, [Bay Rivers] shall have no interest in and no right to the payment of any such Sold Invoice, at law or in equity.

Pl.'s Ex. 2, § 2.5. Section 3 of the Factoring Agreement reinforces Beach Commercial's ownership of the invoice proceeds: "[Bay Rivers] understands and acknowledges that any Customer payment of a Sold Invoice or of a re-billing of a Sold Invoice is the <u>SOLE</u> property of [Beach Commercial] and that [Bay Rivers] shall have no interest in and no right to such payment, at law or in equity." *Id.* § 3.9. The Court finds that the Factoring Agreement manifestly reflects the intent of the parties that Beach Commercial, not Bay Rivers, would retain ownership of all proceeds for invoices it purchased, even when the payments on those invoices were made to and in the possession of Bay Rivers. Accordingly, the parties' explicit assent to Beach Commercial's exclusive ownership of all proceeds of sold invoices is clear evidence of the intent to create an express trust.

Second, the parties agreed that Bay Rivers' use of sold invoice proceeds would be restricted while they remained in Bay Rivers' possession. The Factoring Agreement undeniably prohibited Bay Rivers' use of customer invoice payments on sold invoices for its own benefit. Instead, the Factoring Agreement provided that if a customer paid for a sold invoice by paper check that was sent to Bay Rivers, then Bay Rivers was required "deliver or have delivered to Beach Commercial (1) the original paper check and (2) the original check stub" as promptly as possible. *Id.* § 3.2. If a customer paid Bay Rivers for a sold invoice by Electronic Funds Transfer

("EFT"), then Bay Rivers was required to "(1) email Beach Commercial within 24 hours to notify Beach Commercial of the pending EFT or posted EFT payment, (2) email a copy of the payment advice the Customer sent, and (3) email a screenshot of the EFT payment (deposit) posting to [Bay Rivers'] checking account so that Beach Commercial can initiate an ACH debit." *Id*. § 3.3. Bay Rivers' failure to do so within twenty-four hours constituted an event of default under the Factoring Agreement. *See id*. § 10.1.b. Bay Rivers had clear instructions to notify and send all sold invoice proceeds to Beach Commercial. Such language demonstrates intent to restrict Bay Rivers' use of the proceeds of sold invoices.

Further evidence of the restriction on Bay Rivers' use of the sold invoices' proceeds is found in its duties for the time period between receipt and transmission of the proceeds. According to the plain language of the Factoring Agreement, the invoice proceeds were to be held in trust: "If a Customer pays a Sold Invoice by paper check, [Bay Rivers] shall, without offset, act as a servicing agent and trustee of an EXPRESS TRUST for [Beach Commercial]'s benefit, hold the original check in safekeeping as [Beach Commercial]'s property, and deliver the original check and stub to [Beach Commercial]." *Id.* § 3.6. Bay Rivers was likewise obligated to safeguard electronic payments. *Id*. § 3.7; *see also id*. § 3.3. In *Racetrac Petroleum*, the Court found that the imposition of a comparable duty upon the debtor, to serve as trustee of gasoline proceeds, made "unmistakably clear" the parties' intent that the proceeds would be available for the creditor. *Racetrac Petroleum*, 461 B.R. at 349. Here, the imposition of the duty upon Bay Rivers to serve as the trustee for invoice proceeds under the articulated express trust evidences clear intent by the parties that Bay Rivers would safeguard invoice proceeds and ensure their immediate availability to Beach Commercial, rather than allow Bay Rivers to use the proceeds for its own needs.

Finally, the parties agreed that the invoice proceeds were to be maintained separately from Bay Rivers' other funds: "[Bay Rivers'] employees and officers shall not deposit any checks paying Sold Invoices." Pl.'s Ex. 2, § 3.1. If Bay Rivers' received from a customer's paper check as payment for a sold invoice and a Bay Rivers' employee or officer deposited the check, then Bay Rivers would be in default of the Factoring Agreement. *Id*. § 10.1.a. Upon receipt of an electronic payment for a sold invoice, Bay Rivers was bound by the Factoring Agreement to notify Beach Commercial within 24 hours and to email the specified documentation. *Id*. § 3.3. Bay Rivers was obligated to hold the proceeds in trust until Beach Commercial could debt the amount from Bay Rivers' account. *Id*. § 3.7. Failure to comply with the notification requirements also constituted an event of default under the Factoring Agreement. *Id*. §10.1.b.

On this point, the instant matter can be contrasted to the trust conditions imposed in *Racetrac Petroleum*, where the creditor consented to the commingling of its gasoline proceeds with other funds in the debtor's bank account. *Racetrac Petroleum*, 461 B.R. at 349. Despite the commingling of funds, the Court still found that an express trust existed because both parties had a duty to account for the funds, which were traceable and able to be separately identified. *Id*. at 349-50. Here, the evidence unmistakably indicates the parties' intent to maintain sold invoice proceeds separately. Bay Rivers was not to deposit any checks into its bank account, but rather, was to immediately transmit the checks to Beach Commercial. Pl.'s Ex. 2, §§ 3.1, 3.2. Bay Rivers was further obligated to notify Beach Commercial within 24 hours of receipt of an electronic invoice payment to enable Beach Commercial to withdraw the funds from Bay Rivers' checking account. *Id.* § 3.3.

The relationship set forth in the Factoring Agreement here mirrors the express trust created in *Strack*, where a tractor and farming equipment retailer entered into a floor plan

arrangement with tractor manufacturer Kubota. *In re Strack*, 524 F.3d at 495. The retailer purchased farm equipment from Kubota without up front payment; instead, when a piece of equipment sold, the retailer was responsible for "segregat[ing] the proceeds" and "hold[ing] the same in trust" for Kubota. *Id*. The Fourth Circuit Court of Appeals found such language created an express trust, pointing out that the retailer's right to use the sales proceeds was heavily restricted, and the retailer was required to hold the proceeds separately for Kubota's benefit. *Id*. at 499. Much like the express trust created in *Strack*, Bay Rivers was not entitled to keep the invoice proceeds as its own and use them as it wished. Rather, Bay Rivers was required to keep proceeds separate, hold them for Beach Commercial's benefit, and deliver the proceeds promptly. Therefore, the Court must conclude that the parties clearly expressed an intent to keep sold invoice proceeds separate from other funds or, in the case of an electronic deposit, for Beach Commercial to recover the funds in short order.

In sum, the Factoring Agreement provided for (i) Beach Commercial's exclusive ownership of the proceeds of the purchased invoices; (ii) Bay Rivers' inability to use those proceeds; and (iii) Bay Rivers' separate maintenance of the sold invoice proceeds from its other funds. Therefore, the Court finds that the evidence establishes a clear intent to create an express trust. *See id.*; *Racetrac Petroleum*, 461 B.R. at 350. Thus, the Court finds that the Factoring Agreement gave rise to an express trust, and a consequential fiduciary relationship between Bay Rivers and Beach Commercial was established.[45]

---

[45] Because the Court finds that a fiduciary relationship existed as a result of the express trust created between Beach Commercial and Bay Rivers, the Court need not consider whether Matkins's fiduciary duties shifted from Bay Rivers' shareholders to Beach Commercial once Bay Rivers became insolvent under the Fourth Circuit's holding in *FDIC v. Sea Pines Co.*, 692 F.2d 973, 976-77 (4th Cir. 1982).

b. Did Bay Rivers Commit Fiduciary Defalcation?

Having established the existence of an express trust and resulting fiduciary relationship between Bay Rivers and Beach Commercial, the Court must determine whether Bay Rivers committed fiduciary defalcation. The Supreme Court's decision of *Bullock v. BankChampaign* provides guidance as to the requisite mental state for a showing of defalcation. *Bullock v. BankChampaign, N.A.*, 569 U.S. 267 (2013).[46] In *Bullock*, the Supreme Court described the required state of mind as "involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." *Id.* at 269. The Court further expounded that when "the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct," defalcation requires a showing that the fiduciary "'consciously disregard[ed]' (or [was] willfully blind to) 'a substantial and unjustifiable risk' that his conduct [would] . . . violate a fiduciary duty.'" *Id.* at 274 (quoting Model Penal Code § 2.02(2)(c) (Am. Law Inst. 1985)). Therefore, if the fraudulent conduct does not involve bad faith, moral turpitude, or other immoral conduct, then the conduct must involve an "intentional wrong," which includes "not only conduct that the fiduciary knows is improper but also reckless conduct." *Id.* The defendant's state of mind is therefore crucial to resolving a § 523(a)(4) cause of action. Whether the culpable state of mind existed depends on the facts and circumstances of the case, such that the Court must infer the debtor's intention. *Chavis v. Mangrum* (*In re Mangrum*), 599 B.R. 868, 876 (Bankr. E.D. Va. 2019); *MacArthur Co. v. Cupit* (*In re Cupit*), 514 B.R. 42, 51 (Bankr. D. Col. 2014). A corporation's mental state is revealed though the beliefs and actions of its officers and agents. *N.Y. Cent. & Hudson River R.R. Co. v. United States*, 212 U.S. 481, 492-93 (1909)

---

[46] Prior to *Bullock*, the state of mind required to prove defalcation was relatively low. "[N]egligence or even an innocent mistake which results in misappropriation or failure to account" adequately proved defalcation. *See Rwanda v. Uwimana* (*In re Uwimana*), 274 F.3d 806, 811 (4th Cir. 2001).

("Since a corporation acts by its officers and agents, their purposes, motives, and intent are just as much those of the corporation as are the things done."). Therefore, because Matkins was Bay Rivers' president and principal on the Factoring Agreement, as well as the one who deposited the Glotech Check, his state of mind must be considered when determining whether Bay Rivers violated its fiduciary duty to Beach Commercial.

Here, no allegation has been made that the conduct in question involves bad faith, moral turpitude, or other immoral conduct.[47] Thus, the Court must determine whether Bay Rivers, through its officers and agents, was subjectively aware of its fiduciary duties to Beach Commercial as the threshold issue of its determination of whether either a conscious disregard or willful blindness to a substantial and unjustifiable risk occurred here. *See In re Mangrum*, 599 B.R. at 877 (citing *Caitlin Energy, Inc. v. Rachel* (*In re Rachel*), 527 B.R. 529, 543 (Bankr. N.D. Ga. 2015)). It is insufficient to show that the debtor should have known of the fiduciary duties. *In re Cupit*, 514 B.R. at 53. Rather, the Court must examine the characteristics of the particular debtor, including whether the agreement to serve as a fiduciary was entered into voluntarily as well as the debtor's knowledge and sophistication, in determining subjective awareness. *In re Mangrum*, 599 B.R. at 878; *In re Rachel*, 527 B.R. at 543.

If Beach Commercial satisfies its burden of showing that Bay Rivers was subjectively aware of its fiduciary duty, the Court must then determine whether Bay Rivers consciously

---

[47] Bay Rivers' deposit of the Glotech Check and subsequent failure to notify Beach Commercial could give rise to the type of "bad faith, moral turpitude, or other immoral conduct" associated with fraud or embezzlement. To this end, Matkins testified that he intended to pay the amount listed on the Glotech Check to Beach Commercial but needed the money to pay employees and cover production costs. *See* Tr. 131, 162-65. At the time, Bay Rivers was struggling to meet payroll, and Matkins thought he would soon receive additional funds from shareholders and BB&T to enable him to pay Beach Commercial. *Id.* at 131, 165, 167. The Court need not determine whether depositing the Glotech Check gave rise to bad faith, moral turpitude, or other immoral conduct because, as explained herein, Bay Rivers consciously disregarded a substantial and unjustifiable risk that depositing the Glotech Check would violate its fiduciary duties.

disregarded or was willfully blind to the risk of violating those duties when the Glotech Check was deposited into the Chesapeake Bank account. *In re Cupit*, 514 B.R. at 51 (citing *Bullock*, 569 U.S. at 274). As the Supreme Court wrote in *Bullock*, conscious disregard or willful blindness is considered equivalent to actual knowledge of wrongdoing. *Bullock*, 569 U.S. at 268. Conscious disregard requires "some evidence that the debtor was aware of the fiduciary duty and of the risk that his conduct would violate that duty." *In re Cupit*, 514 B.R. at 51. It is axiomatic that "[a] debtor cannot consciously disregard a risk of violating a fiduciary duty if he or she is wholly unaware of the duty." *Id*. Thus, to prove conscious disregard, the evidence must show that "the debtor was subjectively aware that his conduct *might* result in a breach of that fiduciary duty." *In re Mangrum*, 599 B.R. at 877. To show "willful blindness," the Supreme Court has announced a two-part test: "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011). The debtor thus must make a purposeful decision to avoid ascertaining the existence of a fact he believes has a high probability of existence. *In re Cupit*, 514 B.R. at 52 (citing Model Penal Code § 2.02(2), cmt. 9 (Am. Law Inst. 1985)). The "willful blindness" requirement therefore requires a higher subjective standard of awareness. *In re Mangrum*, 599 B.R. at 877.[48]

The Supreme Court also held in *Bullock* that if the debtor consciously disregarded or was willfully blind to the risk, then the risk of violating the fiduciary duty must be "substantial and unjustifiable." *Bullock*, 569 U.S. at 274. The Court must assess both the likelihood and the

---

[48] The Supreme Court further distinguished willful blindness from reckless indifference, explaining that a reckless defendant "merely knows of a substantial and unjustified risk of such wrongdoing." *Glob.-Tech Appliances, Inc.*, 563 U.S. at 770. Because the defendant must take a deliberate step to avoid confirming a high probability of wrongdoing, the requirements of willful blindness are limited in scope and surpass recklessness and negligence. *Id*. at 769.

magnitude of the harm that may occur from the debtor's conduct to determine if the risk is substantial. *In re Cupit*, 514 B.R. at 52 (quoting *People v. Hall*, 999 P.2d 207, 218 (Colo. 2000)). The "unjustifiable" condition requires the Court to explore "'the nature and purpose of the actor's conduct relative to how substantial the risk is.'" *Id.* (quoting *Hall*, 999 P.2d at 218). The "substantial and unjustifiable" inquiry must show a disregard that is a "gross deviation" from the conduct that a "law-abiding person" facing the same situation as that presented to the debtor would undertake. *Bullock*, 569 U.S. at 274 (citing Model Penal Code § 2.02(2) (Am. Law Inst. 1985)); *see also In re Mangrum*, 599 B.R. at 877 (citing *Larsen v. Larsen* (*In re Larsen*), Adv. No. 1-16-01116-NHL, 2018 WL 4006935, at *7 (Bankr. E.D.N.Y. Aug. 17, 2018)) (finding that the debtor is provided a "safe harbor" if the "law-abiding person" would have pursued the same conduct under the circumstances and in light of the risk of violating the fiduciary duty).

In the instant matter, there is ample evidence that Bay Rivers, through Matkins, was subjectively aware of its fiduciary duties. Matkins met with Richardson and BB&T officers on February 8, 2017, to review the Factoring Agreement's key terms. Tr. 112-13; *see also* Pl.'s Ex. 16, at 2. Matkins's testimony that he only reviewed the key points of the Factoring Agreement conflicts with Richardson's testimony, who stated that he and Matkins reviewed the agreement line by line. *Compare* Tr. 19, *and id.* at 49-51, *with id.* at 113. In addition, a review of the Factoring Agreement shows that Matkins initialed the bottom of each page as well as signed Section 16, which states, "Seller and each Principal have read and fully understood all its provisions, or have had the opportunity to inquire about the meaning and intent of such provisions." Pl.'s Ex. 2, § 16; *see also* Tr. 113. Matkins produced no evidence to counter a conclusion that he understood the agreement's contents. Therefore, the Court concludes that Bay Rivers, via Matkins, possessed the requisite subjective awareness of its fiduciary duties.

Under the Factoring Agreement, all checks and electronic payments for sold invoices belonged Beach Commercial upon purchase. Pl.'s Ex. 2, §§ 2.5, 3.9. Furthermore, Bay Rivers, as trustee for payments on sold invoices prior to sending them to Beach Commercial, owed two key duties under the Factoring Agreement: to refrain from depositing any checks belonging to Beach Commercial and to hold proceeds in trust before they were delivered to Beach Commercial. *Id*. §§ 3.2, 3.6, 3.7. Further, while Matkins was admittedly not a businessman by trade, having worked in the productions environment of the shipbuilding and machining industries for over twenty-five years, he also built Bay Rivers from the ground up, securing initial capital investments from nineteen other investors. *See* Tr. 104-08, 132-33. He successfully secured funding in the form of lines of credit from two banks. *Id*. at 108-09. Bay Rivers was awarded numerous contracts from shipbuilder Huntington Ingalls Industries and other companies. *Id.* at 106-07. Thus, Matkins was sufficiently sophisticated to understand and appreciate the fiduciary duties contained in the Factoring Agreement. The above facts convince the Court that Matkins understood the Factoring Agreement's contents and the fiduciary duties imposed on Bay Rivers and thus that Bay Rivers, through its principal Matkins, was subjectively aware of its fiduciary duties.

The Court also finds that Bay Rivers, through Matkins, consciously disregarded the risk that depositing the Glotech Check would breach its fiduciary duties to Beach Commercial. Despite being cognizant of the fiduciary duty to safeguard such funds, Matkins deposited the Glotech Check in clear violation of Bay Rivers' duty to hold such checks in trust. *Compare* Tr. 37-38, *and id*. at 163-64, *with* Pl.'s Ex. 2, §§ 3.1, 3.6. Matkins admitted at trial that he knew Beach Commercial owned the check and that Richardson had asked about Glotech's payment multiple times, but he did not advise Beach Commercial that he deposited the check until weeks

later. Tr. 37, 163-64. When Matkins told Bleicken that he deposited the Glotech Check, Bleicken advised him to reverse the deposit, (Pl.'s Ex. 28, at 93), but Matkins failed to do so. Bay Rivers had clear instructions to safeguard and hold checks received for sold invoices in trust but through Matkins, it failed to follow those instructions and comply with its fiduciary duties. Matkins argues that he deposited the check with the intent to eventually pay the amount of the check to Beach Commercial but needed the money for Bay Rivers' bills, payroll, and material costs. Tr. 125, 131, 162, 164-67. Even assuming the truth of this statement, Matkins's intent to later pay Beach Commercial does not absolve Bay Rivers' conscious disregard of its known fiduciary duties. Because Matkins was subjectively aware of Bay Rivers' fiduciary duties and yet deposited the Glotech Check knowing it belonged to Beach Commercial and immediately dissipated the deposited money to entities other than Beach Commercial, the Court finds that Bay Rivers, through Matkins, consciously disregarded the risk of violating its fiduciary duties.[49]

To determine whether the risk was "substantial and unjustifiable," such that Bay Rivers' conduct constituted a "gross deviation from the standard of conduct that a law-abiding person would observe," the Court first must examine the "substantial" aspect: the likelihood and magnitude that harm may have occurred as a result of Bay Rivers' conduct. The likelihood that Beach Commercial would be harmed by Bay Rivers' violation was, in short, extremely high. The factoring relationship unequivocally contemplated that Beach Commercial expected to collect invoice proceeds in exchange for upfront payments to Bay Rivers when it purchased the invoices. Beach Commercial would naturally be harmed if Bay Rivers instead deposited and spent those proceeds. Because Bay Rivers failed to comply with its fiduciary duties, Beach

---

[49] Because the Court finds that Bay Rivers consciously disregarded the risk of violating its fiduciary duties, it need not determine whether Bay Rivers was "willfully blind" to that risk as well.

Commercial was unable to obtain the funds from the Glotech Check. The magnitude of the harm is likewise significant given that Beach Commercial had purchased the associated Glotech invoices on June 8, 2017, and on the same day paid Bay Rivers a down payment of $28,003.71. *See* Pl.'s Ex. 7. When Glotech paid those invoices, Beach Commercial had no opportunity to possess the invoice proceeds because of Bay Rivers' fiduciary breach. Beach Commercial did not learn of these events until almost one month later, increasing the magnitude of the harm by lengthening the amount of time Beach Commercial was deprived of the funds.

The Court cannot find that the conduct here was in any way justifiable. Evaluating the "nature and purpose" of Matkins's conduct as it relates to the substantiality of the risk, it is unquestionable that Matkins acted only in the interest of Bay Rivers. While desiring to pay one's employees is noble as it relates to those employees' well-being, such nobility of action does not obviate the unjustifiable nature of Matkins's conduct here. The same can be said for Matkins's attempts to maintain his pipeline of materials from other creditors by paying them.

Thus, the Court concludes that Bay Rivers' conscious disregard of the risk of violating its fiduciary duty to Beach Commercial was substantial and unjustifiable, representing a "gross deviation from the standard of conduct that a law-abiding person would observe[.]" *Bullock*, 569 U.S. at 274. When he deposited the Glotech Check, Matkins testified he needed to use the funds to pay Bay Rivers' expenses and that he expected imminent cash infusions from shareholders and BB&T, which presumably he could use to repay Beach Commercial. Tr. 125, 131, 164-65, 167-68. Even so, the Court cannot conclude that a law-abiding person or entity in Bay Rivers' position would engage in similar behavior under comparable circumstances when it was abundantly clear that all payments for invoices purchased by Beach Commercial were the sole property of Beach Commercial. The instant case bears similarity to *MacArthur Co. v. Cupit* (*In*

*re Cupit*), 514 B.R. 42 (Bankr. D. Colo. 2014). In that case, the debtor testified that he misdirected funds belonging to the creditor to improve his company's poor financial condition and to pay material suppliers. *Cupit*, 514 B.R. at 52-53. The Court noted that, in the context of defalcation, the risk would be justified if there were some possible interest or benefit to the trust beneficiary that outweighed misuse of the trust funds. *Id.* at 53. However, the debtor used the funds to improve his company's position, not the trust beneficiary's position; thus, the Court found that "[s]uch a self-serving interest [could] not justify a risk of harm to the [trust beneficiary]."[50] *Id.* Likewise here, Matkins used funds from the Glotech Check for Bay Rivers' direct benefit (to cover material and payroll costs), with no commensurate benefit to Beach Commercial. A review of Bay Rivers' Chesapeake Bank statements corroborates his testimony. *See generally* Pl.'s Ex. 13.

In sum, because Bay Rivers, through Matkins, read and understood the Factoring Agreement's terms and yet still deposited the Glotech Check, the related invoices for which Bay Rivers had sold to Beach Commercial, the Court finds that Bay Rivers was subjectively aware of its fiduciary duties and consciously disregarded the risk that of violating those duties. Because the likelihood and magnitude of potential harm by reason of Bay Rivers' violation was great and because a reasonable person or entity in Bay Rivers' position would not have deposited the check for self-serving purposes, the Court finds that the risk of Bay Rivers violating its fiduciary duties was "substantial and unjustifiable." Accordingly, the Court finds that Beach Commercial has established by a preponderance of the evidence that Bay Rivers committed fiduciary defalcation under Section 523(a)(4).

---

[50] The Court in *Cupit* cited the Model Penal Code to exemplify a justifiable risk: "[I]f a surgeon performs an operation that has a high risk of killing the patient, but the patient will certainly die without the operation, then the risk is justified." *Cupit*, 514 B.R. at 53 (citing Model Penal Code and Commentaries § 20.02 cmt. 3, at 237).

c. Matkins's Liability for Bay Rivers' Fiduciary Defalcation

As a final matter, the Court must address Matkins's liability for Bay Rivers' fiduciary defalcation. Because Beach Commercial seeks to prevent the discharge of Matkins's guaranteed debt pursuant to the Continuing Guaranty and Waiver, Beach Commercial must not only show that Bay Rivers defalcated while acting as a fiduciary to Beach Commercial, but also that Bay Rivers' actions are attributed to Matkins. *See Airlines Reporting Corp. v. Ellison* (*In re Ellison*), 296 F.3d 266, 270-71 (4th Cir. 2002). The Fourth Circuit Court of Appeals addressed a similar fact pattern in *Airlines Reporting Corp. v. Ellison*, where the debtors owned a travel agency that incurred debts as a result of fiduciary defalcation. *Id*. at 269. Both the Bankruptcy and District Courts concluded that the debtors' personal guarantee of their travel agency's indebtedness to the plaintiff caused them to be personally liable to the plaintiff. *Id*. On appeal, the Fourth Circuit Court of Appeals held that (1) the debtors personally guaranteed their travel agency's debt to the plaintiff; (2) the travel agency's debt arose from a breach of its fiduciary duty to the plaintiff; (3) the travel agency's breach of fiduciary duty was caused by the debtors' personal conduct; and (4) the debtors' conduct constituted a breach of their fiduciary duty to their travel company. *Id*. at 271. As a result, the Fourth Circuit determined that the indebtedness under the debtors' personal guarantee resulted from their defalcation while acting in a fiduciary capacity and thus was not dischargeable under 11 U.S.C. § 523(a)(4). *Id*.

The facts in the instant case align with the four factors discussed in *Airlines Reporting*. First, as previously explained, Matkins personally guaranteed Bay Rivers' debt by signing the Continuing Guaranty and Waiver. Second, Bay Rivers' indebtedness to Beach Commercial arose from a breach its fiduciary duty to Beach Commercial, which arose pursuant to an express trust created in the Factoring Agreement. *See* Pl.'s Ex. 2, § 3.6. Instead of safeguarding those funds

for Beach Commercial's benefit, Bay Rivers consciously disregarded a substantial and unjustifiable risk of violating its fiduciary duties by depositing the Glotech Check and spending its proceeds, contrary to the terms of the Factoring Agreement. Tr. 37, 163-64; Pl.'s Ex. 2, § 3.1. Matkins admitted his personal responsibility for the conduct that gave rise to Bay Rivers' defalcation to Beach Commercial, *i.e.*, the deposit of the Glotech Check. As the endorsing principal under the Factoring Agreement, Matkins reviewed its key terms and certified that he read and understood the requirements arising under it. Tr. 19, 49-51, 112-13; Pl.'s Ex. 2, § 16. Despite his awareness of the duties Bay Rivers owed to Beach Commercial, Matkins personally deposited the Glotech Check into the Chesapeake Bank account in violation of Bay Rivers' fiduciary duties to Beach Commercial. *See* Tr. 37-38. 163-64; Pl.'s Ex. 2, §§ 3.2, 3.6, 3.7.

Fourth, Matkins breached his fiduciary duty to Bay Rivers. Matkins was Bay Rivers' president and by definition owed fiduciary duties to Bay Rivers. *Matson v. Alpert* (*In re LandAmerica Fin. Grp., Inc*.), 470 B.R. 759, 797 (Bankr. E.D. Va. 2012) ("Corporate officers are agents who owe duties to both the corporation and its shareholders."); *Giannotti v. Hamway*, 239 Va. 14, 24 (1990) ("A corporate officer has the same duties of fidelity in dealing with the corporation that arise in dealings between a trustee and a beneficiary of the trust."). Because Matkins himself was responsible for Bay Rivers' commission of fiduciary defalcation, thereby forcing Bay Rivers to incur debt and default on the Factoring Agreement, Matkins violated his fiduciary duty of care to Bay Rivers. *See O'Connor v. First Nat'l Investors' Corp. of Va.*, 163 Va. 908, 926-27 (1935) ("[T]he degree of care required of the directors of a corporation must depend upon the character of the corporation and the circumstances of each particular case."); *Marshall v. Farmers' & Mechanics' Sav. Bank*, 85 Va. 676, 8 S.E. 586, 590 (1889) ("Directors, as trustees of a corporation, are bound to manage the affairs of the company with the same degree of care and

prudence which is generally exercised by business men in the management of their own affairs."). Accordingly, like the Fourth Circuit Court of Appeals concluded in *Airlines Reporting*, this Court finds that Matkins's indebtedness under his personal guaranty resulted from his defalcation while acting in a fiduciary capacity to Bay Rivers, and thus the indebtedness to Beach Commercial should be determined nondischargeable under 11 U.S.C. § 523(a)(4).[51] The amount of the nondischargeable debt will be discussed in Section E., below.

### D. Beach Commercial's Motion in Limine

As detailed earlier, on February 4, 2019, Beach Commercial filed a Motion in Limine, asking the Court to prohibit Matkins from introducing certain evidence as a sanction for his alleged delays in and unclear responses to discovery requests, pursuant to Federal Rule of Bankruptcy Procedure 7037. Motion in Limine, at para. 25; *see also id.* at paras. 19-24. Rule 7037 incorporates Federal Rule of Civil Procedure 37 and sets forth, among other things, a nonexhaustive list of sanctions that may be imposed where a party fails to comply with a discovery order. Those sanctions include "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters into evidence[.]" Fed. R. Civ. Proc. 37(b)(2)(A)(ii).

As evidenced by the Court's findings in this matter, even if the Court accepted Beach Commercial's contention that Matkins failed to sufficiently respond to discovery requests and otherwise comply with this Court's Pretrial Order entered on August 10, 2018, the Court would still find that Beach Commercial satisfied its burden of proof that Matkins's debt pursuant to the

---

[51] As the Court has concluded that the debt related to the Glotech Check is nondischargeable as a result of fiduciary defalcation pursuant to § 523(a)(4), it need not determine whether the actions here also constitute false pretenses, false representation, or actual fraud under § 523(a)(2)(A); or embezzlement or larceny under § 523(a)(4) of the Bankruptcy Code and Virginia Code § 18.2-111.

Guaranty is nondischargeable. Accordingly, the Court finds that Beach Commercial's request to restrict Matkins's presentation of evidence under Rule 7037 is moot.

E. Amount of Nondischargeable Debt

Having found that the debts incurred by Bay Rivers related to the Huntington Ingalls Invoices and the Glotech Check are nondischargeable and that Matkins is liable for the debts as a result of the Guaranty, the Court must calculate the amounts of those nondischargeable debts. The calculation of damages requires the Court to first determine the base amount of damages for each group of invoices, as all other computations are necessarily dependent thereupon. It is undisputed that Bay Rivers sold to Beach Commercial three Huntington Ingalls Invoices with the face value amounts of $21,260.37, $46,408.05, and $67,210.72, for a total face value of $134,879.14. Pl.'s Ex. 8; Pl.'s Ex. 9. It is likewise undisputed that the three invoices issued to Glotech had a combined face value of $34,921.70 ($15,347.20, $6,856.30, and $12,718.20). Pl.'s Ex. 6; Pl.'s Ex. 17, at 6.

Two recourse provisions of the Factoring Agreement are triggered here, which cause the Court to conclude that the base amount of damages for the three Huntington Ingalls Invoices equals their face value of $134,879.14 and that the base amount of damages for the three Glotech invoices totals $34,921.70. Section 5.2.i. of the Factoring Agreement provides: "[Beach Commercial] shall have full recourse against [Bay Rivers] for any unpaid Sold Invoice . . . [i]f [Bay Rivers] or any Principal has breached of [*sic*] any of the representations or warranties contained in this Agreement regarding the unpaid Sold Invoice." Pl.'s Ex. 2, § 5.2.i. Subsection (*l*) provides Beach Commercial with full recourse if the down payment report so notes and Bay Rivers failed to void such sale as a result of the imposition of the full recourse condition. *Id.* § 5.2.*l.* The Court has concluded that Bay Rivers breached the Factoring Agreement when it sold

71

the Huntington Ingalls Invoices despite Huntington Ingalls not having received the goods listed

thereon. Pl. Ex. 2, § 9.1. In addition, the Huntington Ingalls Invoices and the Glotech invoices

were all purchased subject to full recourse against Bay Rivers. Pl.'s Ex. 7; Pl.'s Ex. 10. This

conclusion is further bolstered by the plain language of Section 2.5 of the Factoring Agreement,

which indicates that "ownership of and title to each Sold Invoice shall pass to Beach Commercial

[when] (1) Beach Commercial deposits the Downpayment proceeds[.]" Pl.'s Ex. 2, § 2.5.

Beach Commercial also claims that it is owed certain interest and fees in addition to the

face value amounts of the invoices: (1) "factoring fees" pursuant to Section 2.6 of the Factoring

Agreement; (2) a 1% late fee under Section 5.4 of the Factoring Agreement; (3) a 3% APR

interest charge in accordance with Section 5.5 and the default provisions in Section 10 of the

Factoring Agreement; and (4) attorney fees of $10,583.50, which amount excludes attorney fees

incurred after April 13, 2018. Tr. 43-44; Pl.'s Ex. 2, §§ 2.6, 5.4, 5.5, 10.2.k; Complaint, at paras.

28-29; *see also* Pl.'s Ex. 25. The Complaint asserts that the total nondischargeable debt owed to

Beach Commercial is $191,097.55. Complaint, at prayer para. iv; Pl.'s Ex. 25. The Court will

evaluate Beach Commercial's entitlement to each of these additional amounts below.

1. Factoring Fees

Beach Commercial asserts that it is entitled to "factoring fees" worth 3.75% of the

Huntington Ingalls and Glotech invoices' face value, or $5,057.97 and $1,309.56 respectively,

under Section 2.6 of the Factoring Agreement. *See* Pl.'s Ex. 25. However, what Beach

Commercial characterizes as a "factoring fee" is better understood as it is denominated in the

Factoring Agreement: a purchase discount.  If a purchased invoice was paid in full, the purchase

discount would reduce the amount of the second payment made to Bay Rivers; it did not increase

the total amount of the invoice. Under Section 2.6 of the agreement, if Beach Commercial

received a customer payment within 30 days of purchasing the invoice, then Beach Commercial received a "purchase discount" equal to 1.25% of the invoice's face value. Pl.'s Ex. 2, § 2.6. The purchase discount increased by 0.25% roughly every seven days thereafter. *Id*. Beach Commercial retained a maximum purchase discount of 3.75% of the invoice's face value for customer payments received 98 to 105 days from the purchase date of the invoice. *Id*. The purchase discount was retained from the amount paid by the customer, after which the Factoring Agreement contemplates Beach Commercial making a second payment to Bay Rivers, calculated as "the amount the Customer paid, less the Downpayment, less the purchase discount, plus any amount due to Beach Commercial (i.e. the cost of wire transfers)." *Id*. § 2.9. As such, the purchase discount is *part of* the total invoice payment, *not* a fee *in addition to* the amount of the invoice.

Thus, Beach Commercial misapprehends the purpose of the purchase discount in the existing circumstances. Under the Factoring Agreement, the purchase discount is retained by Beach Commercial only when a payment by Bay Rivers' customer is made on a sold invoice. *Id*. The purchase discount was to be realized by Beach Commercial only if the condition precedent—a payment on the invoice by Bay Rivers' customer—is satisfied. In the event of default, the purchase discount provision becomes contractually inoperable. There is no argument that the requisite condition—payment from Bay Rivers' customer—did not occur for either the Huntington Ingalls Invoices or the invoices related to the Glotech Check. Thus, Beach Commercial's argument regarding its entitlement to "factoring fees" is negated. Accordingly, by the plain language of the Factoring Agreement, the Court concludes that Beach Commercial is not entitled to the asserted "factoring fees" in addition to the face value of the invoice.

2. 1% Late Fee

Beach Commercial asserts that Bay Rivers incurred a 1% late fee under Section 5.4 of the

Factoring Agreement on both the Huntington Ingalls Invoices and the Glotech invoices. An

analysis of several sections of the agreement leads the Court to conclude that the required

conditions in Sections 5.2 and 5.4 have been satisfied here, and Beach Commercial is indeed

entitled to the 1% late fee on both groups of invoices. Section 5.2 provided Beach Commercial

with full recourse against Bay Rivers if any of the enumerated circumstances in subsections (a)

through (o) occurred. *Id*. § 5.2. If any of the events in Section 5.2 transpired, then pursuant to

Section 5.3, Bay Rivers was responsible for "immediately notify[ing] and . . . offer[ing] to

immediately reimburse [Beach Commercial][.]" *Id*. § 5.3. If Bay Rivers failed to reimburse

Beach Commercial for such invoice within ten days, then Bay Rivers agreed to pay a late fee

equivalent to 1% of the sold invoice's face value under Section 5.4. *Id*. § 5.4.

Under Section 5.2.i, Beach Commercial also had full recourse if Bay Rivers "or any

Principal" breached any of the representations or warranties regarding an "unpaid Sold Invoice."

*Id*. § 5.2.i. The Factoring Agreement provides an example of such a breach: Bay Rivers "selling

[Beach Commercial] an invoice before [Bay Rivers'] Customer has received all the

goods/services ordered and before Customer has finalized the approval of such Invoice for

payment[.]" *Id*. Under the Factoring Agreement, "principals" means "individuals who execute[d]

this Agreement or related Guaranty for the purpose of ensuring the accuracy . . . of certain

representations of [Bay Rivers] and guaranty the Obligations and the performance of certain

covenants by [Bay Rivers] . . . by virtue of their close association to [Bay Rivers] as an owner,

officer, principal, or employee and who do so in consideration of the benefits which they directly

or indirectly derive from [Beach Commercial]'s purchase of Invoices from [Bay Rivers]." *Id*. §

15.13. "Invoice" is defined as "[a]ny presently existing or hereafter created document generated

and owned by [Bay Rivers] evidencing a right to payment of a monetary obligation, arising or

resulting from the sale . . . and delivery of goods . . . whether or not earned by performance[.]"

*Id*. § 15.9. In turn, "sold invoice" is described as "[a]ny Invoice sold by [Bay Rivers] to Beach

Commercial pursuant to this Agreement" *Id*. § 15.17.

There is no dispute that Matkins was Bay Rivers' principal and in his capacity as Bay

Rivers' president, he reviewed the Factoring Agreement's key terms and signed the agreement

on the company's behalf. In addition, the Huntington Ingalls Invoices that Bay Rivers sold to

Beach Commercial evidenced a right to payment by Bay Rivers. Matkins does not challenge that

the Huntington Ingalls Invoices constitute "sold invoices" under the Factoring Agreement. The

details surrounding the sale of the Huntington Ingalls Invoices perfectly align with the

illustration in Section 5.2.i. Matkins does not deny that Bay Rivers sold the Huntington Ingalls

Invoices to Beach Commercial without Huntington Ingalls having received the goods listed on

them nor does he contest that Bay Rivers' representation in that regard on the June 27, 2017 ATS

Agreement was false. By making such misrepresentation, Bay Rivers breached its warranty

under Section 9.1 of the Factoring Agreement that each sold invoice was "an accurate and

undisputed statement of a Customer's indebtedness owed to [Bay Rivers] . . . for goods sold to,

delivered to, and accepted by the Customer[.]" *Id*. § 9.1. The Huntington Ingalls Invoices were

therefore not an accurate representation of Huntington Ingalls' indebtedness to Bay Rivers. The

provisions of Sections 5.2.i, 5.3, and 5.4 thus apply, entitling Beach Commercial to a 1% late fee

for the Huntington Ingalls Invoices, the face values of which are evidenced in Plaintiff's Exhibit

8, as follows:

| Invoice Number | Face Value | | 1% Late Fee |
|---|---|---|---|
| 11093 | $21,260.37 | | $212.60 |
| 11094 | $46,408.05 | | $464.08 |
| 11097 | $67,210.72 | | $672.11 |
| **Invoice Total:** | **$134,879.14** | **Late Fee Total:** | **$1,348.79** |

The Court further concludes that Bay Rivers owes a 1% late fee for the invoices corresponding to the Glotech Check. Section 9.3 of the Factoring Agreement precisely states that "[i]t is the express intention of [Bay Rivers] to transfer, sell or assign to [Beach Commercial] only the specific right to payment represented by [a Sold] Invoice . . . ." *Id*. § 9.3. In conjunction with Section 9.3, Section 5.2.*l.* was triggered here, providing Beach Commercial with full recourse against Bay Rivers because the invoices were purchased subject to that condition and Bay Rivers failed to void such sale as a result of the imposition of that condition. *Id*. § 5.2.*l*. Subsection 5.2.*l* further provides that if the invoice sale is not voided, the "sale shall be considered valid and binding and subject to the terms of this Agreement[.]" *Id*. Bay Rivers, via Matkins, deposited the Glotech Check into the Chesapeake Bank account and spent the proceeds, all without advising Beach Commercial. Doing so violated the Factoring Agreement's provisions requiring Bay Rivers to hold all paper checks in trust until their delivery to Beach Commercial and prohibiting Bay Rivers' officers or employees from depositing such paper checks into its bank account. *Id*. §§ 3.1, 3.6. Pursuant to Section 5.3, upon violation of the Factoring Agreement's terms, Bay Rivers was required to immediately notify and offer to reimburse Beach Commercial for the invoice. *Id*. § 5.3. If not reimbursed within ten days, then Beach Commercial was entitled under Section 5.4 to a 1% late fee based upon the invoice's face value. *Id*. § 5.4. As it is undisputed that the requirements of Section 5.3 were unfulfilled here, the Court finds that Bay Rivers owes the 1% late fee for each invoice corresponding with the Glotech Check (*see* Pl.'s Ex. 6) calculated as follows:

| Invoice Number | Face Value | | 1% Late Fee |
|---|---|---|---|
| 11043 | $15,347.20 | | $153.47 |
| 11044 | $6,856.30 | | $68.56 |
| 11045 | $12,718.20 | | $127.18 |
| **Total:** | **$34,921.70** | **Total:** | **$349.22** |

Accordingly, the Court finds that Bay Rivers incurred late fees totaling $1,348.79 for the Huntington Ingalls Invoices and $349.22 for invoices corresponding with the Glotech Check. The total 1% late fee to be added to the nondischargeable debt is $1,698.01.

### 3. 3% APR Interest

Finally, Beach Commercial prays that the Court assess and include within the nondischargeable amount 3% APR interest on the face values of the Huntington Ingalls and Glotech invoices. Section 5.5 of the Factoring Agreement provides that, if a Bay Rivers customer failed to pay for an invoice sold to Beach Commercial within 105 days from the date the invoice was issued, then Bay Rivers agreed to pay 3% APR interest on the unpaid balance of the invoice until it was paid in full. Pl.'s Ex. 2, § 5.5. Section 10.2.k also provides for a 3% APR interest charge on the unpaid balance of an invoice if Bay Rivers defaulted on the Factoring Agreement. *Id*. § 10.2.k. Under Section 10.1.a, if Bay Rivers' customer paid for a sold invoice by paper check, and an employee or officer of Bay Rivers deposited the check, then Bay Rivers would be in default of the Factoring Agreement. *Id*. § 10.1.a. Bay Rivers would also be in default of the agreement under Section 10.1.e if it failed to pay Beach Commercial for any "Obligation" that was due. *Id*. § 10.1.e. Under the Factoring Agreement, "Obligation" encompasses "[a]ll amounts, recourse reimbursement requirements, . . . obligations, attorneys' fees, . . . interest, late fees, and covenants [Bay Rivers] and/or each Principal . . . owe to [Beach Commercial][.]" *Id*. § 15.11. Last, under Section 10.1.g, Bay Rivers would be in default of the Factoring Agreement if any of

its employees, officers, or principals breached any terms of the agreement. *Id*. § 10.1.g. As Beach Commercial prayed in its Complaint (and restated in Plaintiff's Exhibit 25) for the application of only one 3% APR interest fee, the Court need not determine if the interest rate should be applied when multiple provisions of the Factoring Agreement are triggered. *See* Complaint, at prayer para. iv; Pl.'s Ex. 25.

Application of prejudgment interest is discretionary, *Hannon Armstrong & Co. v. Sumitomo Tr. & Banking Co.*, 973 F.2d 359, 369 (4th Cir. 1992), and "serves to compensate for the loss of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress." *West Virginia v. United States*, 479 U.S. 305, 310 n.2 (1987). "Under Virginia law, a district court 'may provide for interest on any . . . sum awarded . . . and fix the period at which the interest shall commence.' Whether interest should be awarded pursuant to [Virginia Code] [S]ection 8.01-382, and if so, from what date, are matters within the sound discretion of the district court." *Hannon Armstrong*, 973 F.2d at 369 (quoting Va. Code Ann. § 8.01-382) (citing *Marks v. Sanzo*, 231 Va. 350, 355 (1986)).

As the Huntington Ingalls Invoices were never paid, the Court finds that Section 5.5 of the Factoring Agreement applies to those invoices. The Court further finds that Bay Rivers defaulted under Section 10.1.a when Matkins deposited the Glotech Check into the Chesapeake Bank account. Thus, the 3% interest provision contained in Section 10.2.k would be triggered and applicable to the amount owed to Beach Commercial for the Glotech Check. The Court will exercise its discretion and apply the contractual 3% APR interest to both the Huntington Ingalls Invoices and the invoices related to the Glotech Check as prayed for by Beach Commercial. The Court further finds that it is appropriate to assess the interest based upon the time periods prayed

for by Beach Commercial: from the end of the 105-day period following the purchase of each set of invoices to the date Beach Commercial commenced the above-captioned Adversary Proceeding.

The interest charge is calculated by dividing the 3% interest rate by a 360-day year to find the periodic, or daily, interest rate, which is 0.008333% here.[52] The periodic rate is then multiplied by the face value of each invoice to find the daily amount of interest. Finally, the daily interest charge is multiplied by the number of days the invoices were unpaid between the end of the 105-day period following the invoices' purchase and the commencement of the above-captioned Adversary Proceeding. For the Huntington Ingalls Invoices, this time period spanned 183 days (October 11, 2017, through April 13, 2018), and for the invoices corresponding to the Glotech Check, 204 days (September 21, 2017, through April 13, 2018). *See* Pl.'s Ex. 7; Pl.'s Ex. 10; Pl.'s Ex. 25. The calculations of the 3% APR interest fee as applied to each of the Huntington Ingalls Invoices is as follows:

| Invoice Number | Face Value | 3% APR Rate Calculated at Periodic Rate (.03/360) | Daily APR Interest Charge | Number of Days 3% APR Interest was Applied | Additional 3% APR Interest |
|---|---|---|---|---|---|
| 11093 | $21,260.37 | 0.008333% | $1.77 | 183 | $324.22 |
| 11094 | $46,408.05 | 0.008333% | $3.87 | 183 | $707.72 |
| 11097 | $67,210.72 | 0.008333% | $5.60 | 183 | $1,024.96 |
| **Total:** | **$134,879.14** | | | **Total:** | **$2,056.90** |

Likewise, the calculation for the 3% APR interest fee as applied to the invoices corresponding to the Glotech Check is set forth:

---

[52] While Section 10.2.k of the Factoring Agreement specifies that a 360-day year should be used to calculate interest under that provision, Section 5.5 does not contain similar language. *Compare* Pl.'s Ex. 2, § 10.2.k, *with id.* § 5.5. For consistency, the Court will utilize a 360-day year to calculate interest under Section 5.5. In any event, the calculations are virtually identical here.

| Invoice Number | Face Value | 3% APR Rate Calculated at Periodic Rate (.03/360) | Daily APR Interest Charge | Number of Days 3% APR Interest was Applied | Additional 3% APR Interest |
|---|---|---|---|---|---|
| 11043 | $15,347.20 | 0.008333% | $1.28 | 204 | $260.90 |
| 11044 | $6,856.30 | 0.008333% | $0.57 | 204 | $116.56 |
| 11045 | $12,718.20 | 0.008333% | $1.06 | 204 | $216.21 |
| Total: | $34,921.70 | | | Total: | $593.67 |

Accordingly, the Court finds that Bay Rivers incurred interest at 3% APR totaling $2,056.90 for the Huntington Ingalls Invoices. Bay Rivers also incurred 3% APR interest totaling $593.67 for the invoices corresponding with the Glotech Check. The total 3% APR Interest accrued was $2,650.57.

The Court finds that post-judgment interest shall accrue at the federal judgment rate as set forth in 28 U.S.C. § 1961 from the date of entry of the separate Order to be entered consistent with the findings herein.

### 4. Total Amount of Nondischargeable Debt

After carefully reviewing the terms of the Factoring Agreement, the evidence presented, and the factual record, the Court has determined that Bay Rivers is liable for the entire face value of the three Huntington Ingalls Invoices in the amount of $134,879.14 as well as the full face value of the three Glotech invoices, which total $34,921.70, related to the Glotech Check. Bay Rivers is additionally liable for late fees of $1,698.01 and interest in the amount of $2,650.57, for total additional fees of $4,348.58 as relates to both sets of invoices. Therefore, the Court finds that the total amount of the debt owed by Bay Rivers is $174,149.42. Matkins is obligated to Beach Commercial by virtue of the Guaranty, whereby Matkins personally guaranteed all debts and obligations arising under the Factoring Agreement. *See* Pl's Ex. 3. Accordingly, the Court

concludes that the debt to Beach Commercial in the amount of $174,149.42 should be declared nondischargeable as to Matkins in his underlying bankruptcy case.

At trial, counsel for Beach Commercial asked the Court to allow both parties to present evidence related to Beach Commercial's attorney fees after the trial if the Court ruled in Beach Commercial's favor in the event that they are unable to reach an agreement. Tr. 6. The Court therefore deferred hearing both Matkins's objection to Plaintiff's Exhibit 29, which contains a summary of services performed by Beach Commercial's counsel and the related fees. *Id*. at 7. Under the order entered on February 14, 2019, Beach Commercial and Matkins agreed that Beach Commercial would have twenty-one (21) days to either submit a consent order regarding attorney fees or request that the Court determine the amount of attorney fees Matkins owes Beach Commercial. As a result, the Court will withhold consideration of whether the $10,583.50 in attorney fees claimed by Beach Commercial is nondischargeable.

## IV. CONCLUSION

Beach Commercial has proven by a preponderance of the evidence, for reasons detailed here, that Bay Rivers made a false representation under 11 U.S.C. § 523(a)(2)(A) and committed fiduciary defalcation under 11 U.S.C. § 523(a)(4). By operation of the Continuing Guaranty and Waiver, Matkins is liable for the debts related to these actions, and the Court finds that Matkins owes a nondischargeable debt of $174,149.42 to Beach Commercial. The Court will await receipt of either a consent order from the parties regarding the attorney fees owed by Matkins to Beach Commercial, or in the alternative, the parties' request for a hearing date to consider the issue of attorney fees.

The Court will enter a separate Order consistent with the findings and conclusions in this Memorandum Opinion.

The Clerk is directed to transmit a copy of this Memorandum Opinion to Peter G. Zemanian, counsel for the Plaintiff; and Barry W. Spear, counsel for the Defendant.

Entered in the Eastern District of Virginia on this 22nd day of August, 2019.

/s/ Stephen C. St.John
STEPHEN C. ST. JOHN
Chief United States Bankruptcy Judge

Entered on Docket: August 22, 2019